51 Cal.Rptr.3d 223 (2006)
144 Cal.App.4th 1301
Paul MILLER, et al., Plaintiffs and Appellants,
v.
BANK OF AMERICA, NT & SA, Defendant and Appellant.
No. A110137.
Court of Appeal of California, First District, Division Three.
November 20, 2006.
*224 The Sturdevant Law Firm, James C. Sturdevant, Mark T. Johnson, Monique Olivier, Law Offices of Thomas J. Brandi, Thomas J. Brandi, Brian J. Malloy, San Francisco, for Plaintiffs and Appellants.
Barbara Jones, Rochelle Bobroff, Michael Schuster, AARP Foundation Litigation.
Gerald McIntyre, Los Angeles, Deanne Loonin, for amicus curiae National Senior Citizens Law Center, on behalf of plaintiffs and appellants.
Margot Saunders, for amicus curiae National Consumer Law Center, on behalf of plaintiffs and appellants.
Eric Halperin, Kathleen Keest, Amanda Quester, for amicus curiae Center for Responsible Lending, on behalf of plaintiffs and appellants.
Bramson, Plutzik, Mahler & Birkhaeuser, Robert M. Bramson, Walnut Creek, for amicus curiae National Association of Consumer Advocates, on behalf of plaintiffs and appellants.
Bill Lockyer, Attorney General of the State of California, Richard M. Frank, Chief Deputy Attorney General, Tom Greene, Chief Assistant Attorney General, Herschel T. Elkins, Special Assistant Attorney General, for Amici Curiae on behalf of Plaintiffs and Appellants.
*225 Marc A. Lackner, Associate general Counsel, Bank of America, N.A., O'Melveny & Myers, Walter Dellinger, Debra S. Belaga, Matthew D. Roberts, Calvo & Clark, Arne D. Wagner, Morrison & Foerster, Arturo J. Gonzalez, San Francisco, for Defendant and Appellant.
Coblentz, Patch, Duffy & Bass, Jonathan R. Bass, Susan K. Jamison, San Francisco, for amici curiae California Bankers Association and California Credit Union League, on behalf of defendant and appellant.
Arnold & Porter, Laurence J. Hutt, Los Angeles, Howard N. Cayne, Nancy L. Perkins, for amici curiae American Bankers Association, America's, Community Bankers, Consumer Bankers Association, The Financial Services Roundtable and Independent Community, Bankers of America, on behalf of defendant and appellant.
Peter D. Keisler, Assistant Attorney General, Kevin V. Ryan, United States Attorney, William Kanter, Howard S. Scher, Thomas M. Bondy, for Amici Curiae on behalf of Defendant and Appellant.
SIGGINS, J.
Does a bank act illegally if when balancing customer accounts, it applies credits for Social Security benefits and other public benefit payments directly deposited to its customers' checking accounts to cover debits for overdrafts and overdraft fees? In Kruger v. Wells Fargo Bank (1974) 11 Cal.3d 352, 113 Cal.Rptr. 449, 521 P.2d 441 (Kruger), the California Supreme Court prohibited a bank from utilizing the banker's setoff against public benefits to recover on an account holder's delinquent but separate credit card account. In this case, the trial court applied Kruger to prohibit the defendant Bank of America from collecting for overdrafts and fees by debiting directly deposited Social Security and other public benefit payments. This application of Kruger is an extension of its holding that is unwarranted in light of significant differences between the banker's setoff addressed in Kruger and the facts of this case. Accordingly, we reverse the judgment.

BACKGROUND
Representative plaintiff Paul Miller receives Social Security disability benefits directly deposited into his Bank of America (the Bank) checking account. In January 1998, the Bank mistakenly credited $1,799.83 to his account. When the Bank discovered its error, it reversed or "charged back" the credit to Miller's account and he was substantially overdrawn. When Miller's May 1998 Social Security payment was directly deposited, it was automatically balanced against the larger overdraft to reduce his negative balance.
When Miller discovered his account balance was negative, he complained to the Bank's local branch. In response the Bank opened a new account for his Social Security benefits, while leaving the negative balance in the old account, reversed the debit against his May 1998 Social Security payment, and deposited the resulting balance into the new account. But on two later occasions, the Bank again debited Miller's Social Security benefits to reduce the negative balance in his old account. Each time, after Miller complained, the Bank reversed the debits and restored the funds to Miller's account.
Miller's first amended complaint included causes of action for intentional and negligent misrepresentation, intentional infliction of emotional distress, unlawful levy against Social Security benefit payments (Code Civ. Proc., § 704.080), and violation of the Consumer Legal Remedies Act (CLRA) (Civ.Code, § 1750 et seq.), the Unfair Competition Law (UCL) (Bus. & *226 Prof.Code, § 17200 et seq.), and the False Advertising Act (FAA) (Bus. & Prof.Code, § 17500 et seq.). The misrepresentation-based claims were based on two alleged misrepresentations by the Bank: (1) that directly deposited Social Security benefits would be safe, secure, and instantly available to account holders; and (2) that the Bank had the right to use Social Security funds from direct deposit accounts to cover overdrafts and insufficient funds (NSF) charges.
The trial court granted summary adjudication in favor of the Bank on the claims for unlawful levy and intentional infliction of emotional distress. But it denied summary judgment on the remaining causes of action, because a trial was necessary to determine "Whether [the Bank] has a practice of debiting Social Security and other government benefit direct deposit accounts to collect overdrafts, erroneous credits or other claims or debts it has against the depositor without regard to the source of the funds in the account or the fact that the account is one into which such benefits are directly deposited." The court also found there were material issues of fact regarding whether the Bank misrepresented the safety, security and accessibility of direct deposit accounts, and whether its alleged conduct was unfair or fraudulent within the meaning of the UCL.
When it ruled on summary judgment, the court also certified a plaintiff class consisting of "All California residents who have, have had or will have, at any time after August 13, 1994, a checking or savings deposit account with Bank of America into which payments of Social Security benefits or other public benefits are or have been directly deposited by the government or its agent." In 2003, the Bank had 1,079,414 such accounts. Each month more than $800 million in government benefits is electronically deposited into class members' accounts. Between January 1994 and May 2003, the Bank debited at least $284,211,273 in NSF and other overdraft fees from accounts containing Social Security direct deposits.
Miller and four class members gave similar testimony at trial. Each had Social Security or disability payments directly deposited to the Bank's checking account. Like Miller, class member Barbara Washington had other funds credited to her account due to a bank error and the Bank froze her account when it discovered and reversed the error, thereby denying her access to her Social Security benefit payments. Kevin Scott Anderson, Lupe Linda Rios and William Hawkridge each testified that their benefit payments were applied to cover overdrafts, NSF fees and service fees such as debit and automatic teller machine (ATM) fees.
Eric Kingson was called as an expert in Social Security to testify about the general characteristics of Social Security and Supplemental Social Security (SSI) recipients. In California, approximately three million people between the ages of 65 and 84 receive Social Security or SSI; another 400,000 recipients are 85 years old or older. In 2003 the average monthly Social Security benefit in California was $900 to $950; the maximum SSI benefit was $757 per month.
It is undisputed that the Bank covers overdrafts and fees incurred within customers' accounts with government benefits funds that are directly deposited. William Zuendt, a 30-year banker and former president and chief operating officer of Wells Fargo Bank, described standard industry practices. Zuendt explained that all banks clear negative checking account balances from incoming deposits to those accounts irrespective of their source, including deposits of government benefits. His uncontradicted testimony explained *227 that it is standard practice in the banking industry to apply incoming deposits against outstanding overdrafts regardless of the source of the funds.
Zuendt testified that if state law precluded banks from using incoming deposits of benefit payments to clear negative balances,[1] banks would have to impose numerous restrictions on accounts containing government benefits to prevent them from becoming overdrawn. Dan Carretta, an executive at the Bank, described the types of restrictions that would be required. The bank would refuse to honor any cheeks written against insufficient funds by account holders who directly deposit benefit payments, so there would be a higher incidence of dishonored, or "bounced," checks. Other measures would include preventing such customers from using ATM cards at other banks, placing the longest permissible hold on all deposited checks to minimize the incidence of returned items, and restricting or disallowing their use of debit cards.
The trial court instructed the jury that the Bank could not apply benefit funds to overdrafts and NSF fees. Jury instruction number 20 stated that "Governmental benefits, including Social Security funds, are exempt from collection by the bank for insufficient funds fees [], overdrafts and money claims it has against the account holders. This action by the Bank is called a set-off. Funds from other sources are not exempt under this procedure."
The jury found the Bank violated the CLRA by falsely representing to depositors that it had the right to use directly deposited Social Security funds "to pay overdrafts, insufficient funds fees" and "money claims it has against class members." Based on that violation, the jury awarded the class $75,077,836 in compensatory damages for amounts collected as NSF fees, awarded statutory damages of $1,000 for each class member "who suffered substantial economic or emotional damage" as a result of the Bank's conduct and awarded Miller $275,000 in emotional distress damages. On the common law misrepresentation claims, the jury found the Bank had made a "false representation of an important fact" to members of the class, but did not find reliance. It rejected Miller's CLRA claim that the Bank "falsely represent[ed] that its direct deposit accounts are safe and secure for holding government benefits and that the funds in those accounts are instantly available to the account holder."
While the jury was deliberating, the trial court heard additional evidence on nonjury claims under the UCL, the FAA and the CLRA. The trial court found that the Bank violated the CLRA, the UCL, and the FAA. On all counts, the court's decision turned on the interpretation that Kruger prohibits banks from clearing overdrafts and NSF fees, or recovering any "other monetary claims,"[2] from directly deposited *228 benefit funds. Based on this interpretation, the court concluded the Bank violated the CLRA's prohibition against misrepresenting legal rights or remedies (Civ.Code, § 1770, subd. (a)(14)) by asserting in a booklet distributed to account holders that "[t]he law grants us the right of setoff, under certain circumstances, to use funds in your account to pay any debts you owe us." The court also concluded the Bank violated the CLRA's prohibition against unconscionable contract terms (§ 1770, subd. (a)(19)), by attempting to insert that statement into its agreements with class members.
The court identified three distinct violations of the UCL. It concluded the Bank's violations of common law and the CLRA were unlawful business practices; that its account balancing practices were unfair within the meaning of Business and Professions Code section 17500 in light of the policy that governmental benefits are exempt from collection; and that it committed a fraudulent practice by stating it had a right of setoff against its customers' accounts. The court also determined the Bank's statement about setoff violated the FAA's prohibition against untrue or misleading statements. The court rejected the Bank's affirmative defenses, including its argument that Miller's claims are preempted by federal law.
The court awarded compensatory damages and restitution of $296,650,220, the amount of NSF fees it determined the Bank had unlawfully collected from the class, and awarded Miller $275,000. It found "that any class member whose account was set off or assessed in violation of law has suffered substantial emotional or economic harm" under the CLRA, and was therefore entitled to a statutory damages award of $1,000. The court enjoined the Bank from: (1) "making any representation or statement to California customers or potential customers ... that it has the right to set off or take NSF fees or other non-bank-fee money claims it has against customers from directly deposited Social Security benefits and other public benefits in customer deposit accounts in California"; and (2) "taking any directly deposited Social Security benefits or other public benefits from customer accounts in California to satisfy NSF fees and other monetary claims it has against customers."[3]
The Bank filed a timely appeal. Miller cross-appealed from the denial of his claim for prejudgment interest. We issued a writ of supersedeas staying enforcement of the judgment pending appeal, and accepted amicus briefs from a number of interested *229 groups who asked to participate on both sides of the controversy.[4]

DISCUSSION
The variety of statutory and common law offenses embodied in the judgment turn entirely on the court's determination that Kruger prohibits the Bank from clearing overdrafts and debiting NSF fees or other money claims in a deposit account when the credits against those charges are from government benefits directly deposited into that same account. That was the basis for the court's instruction number 20, and the resulting conclusion that the Bank misrepresented that it had the right to clear overdrafts and NSF fees from such deposits. This application of Kruger is also essential to conclude that the Bank violated the CLRA by attempting to enter into unconscionable contracts, and violated the UCL and the FAA by representing that it had the right to apply government benefits to reconcile an account.
Miller relies heavily upon the broadly worded holding of Kruger that "a bank may not exercise its right of setoff against deposits which, derived from unemployment and disability benefits, are protected from the claims of creditors." (Kruger, supra, 11 Cal.3d at p. 356, 113 Cal.Rptr. 449, 521 P.2d 441.) This phrasing, he asserts, "was intended to prohibit a bank's setoff in all situations in which it acts as a creditor and seeks to collect exempt funds to satisfy its claims." But "`"`"the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts."'"'" (Moon v. Superior Court (2005) 134 Cal.App.4th 1521, 1532, 36 Cal.Rptr.3d 854.) The fundamental question for us is whether the Bank's practices are sufficiently like the banker's setoff in Kruger as to fall within the rule announced in that case. In other words, we must examine whether the Bank's practices of debiting accounts containing government benefits to cover overdrafts, NSF fees and bank errors are different in ways such that they should not be governed by the common law rule expressed in Kruger.
Traditionally, the "banker's setoff is a common law practice derived from general principles of equity. (Kruger, supra, 11 Cal.3d at pp. 357, 367, 113 Cal. Rptr. 449, 521 P.2d 441.) It allows a bank to set off an account holder's funds to satisfy an existing mature obligation owing to the bank without resorting to court action. (Gonsalves v. Bank of America (1940) 16 Cal.2d 169, 174, 105 P.2d 118.) In Kruger, the plaintiff maintained a checking account and a separate credit card account with the defendant bank. The only funds in her checking account came from disability and unemployment benefits. The question addressed was whether the bank, using the banker's setoff, could debit those general deposit funds to collect a debt the plaintiff owed on her credit card account.
The Supreme Court held that it could not. By statute, funds derived from state disability insurance and unemployment *230 compensation are exempt from attachment and execution. (Kruger, supra, 11 Cal.3d at p. 367, 113 Cal.Rptr. 449, 521 P.2d 441.) While the statutory exemption afforded to public benefit funds does not explicitly apply to the exercise of a banker's setoff, as a matter of public policy the court extended those statutory exemptions to prohibit the common law setoff employed by the bank in that case.
The court focused on the desirability of protecting government benefit payments from third party creditors' claims: "Although the banker's setoff differs from attachment and execution in that it does not require the aid of a state official, there is no relevant difference between the two procedures as to the state objective of protection of unemployment compensation and disability benefits from claims of creditors. The assertion of a banker's setoff has exactly the same effect as a third party's levy of execution on the accountit deprives the depositor of the income which the state provided him to meet subsistence expenses, compelling the state either to give him additional money or leave him without means of physical survival." (Kruger, supra, 11 Cal.3d at pp. 370-371, 113 Cal.Rptr. 449, 521 P.2d 441, fn. omitted.)
This concern, the court noted, had grown particularly pressing with the advent of commerce based increasingly on credit cards. "With the growth of bank-sponsored credit systems, a bank may gather unto itself the debts incurred by a depositor for past living expenses and satisfy by setoff debts which, in the days before Master Charge and Bank Americard, would have been held by many separate merchants and enforceable only through execution. To permit a bank which has thus collected the past obligations of its depositor to satisfy those claims from unemployment insurance deposits would completely defeat the state policy of preserving such deposits for the daily living expenses of the depositor." (Kruger, supra, 11 Cal.3d at p. 371, 113 Cal.Rptr. 449, 521 P.2d 441, fn. omitted.) Kruger thus prevented banks from circumventing the statutory exemptions of government benefits from attachment and execution when collecting credit card debts through setoff.
We agree with the trial court that this case implicates to some extent the legislative preference at stake in Kruger to safeguard a basic subsistence-level income stream for recipients of public benefits. But allowing a bank to balance overdrafts, collect NSF fees and correct bank errors against deposits to the account in which they were incurred, even deposits of exempt funds, does not enable the bank to collect the customer's third party debts to multiple creditors as did the setoff addressed in Kruger. (Kruger, supra, 11 Cal.3d at p. 371, 113 Cal.Rptr. 449, 521 P.2d 441.) We realize that debiting overdrafts and associated bank fees can cause serious financial distress to recipients of public benefits. Plaintiffs introduced evidence at trial that the likelihood and gravity of such financial distress may be compounded by the Bank's practice of paying the largest checks or charges first. Because the larger items are more likely to overdraw an account, subsequently processed smaller checks which may otherwise have cleared will cause additional overdrafts and NSF fees.[5] But debiting an account holder's deposit to cover a check written on the same account does not present the same risk of circumventing *231 the exemptions of public benefit funds from attachment and execution the Supreme Court addressed in Kruger.
There are other significant differences between this case and Kruger. Unlike the setoff against a credit card debt prohibited there, the judgment here would enjoin a basic method of balancing within a single account. This is not simply a distinction without a difference or a matter of creative accounting. Maintaining a deposit account, especially one with overdraft protection, inherently requires ongoing adjustment of the account balance to reflect debits, including payments and fees, and credits. As has been said in different contexts, it is common knowledge that bank statements on checking accounts "consist of debit and credit entries based on the deposits received, the checks written and the service charges to the account." (People v. Lugashi (1988) 205 Cal.App.3d 632, 642, 252 Cal.Rptr. 434; see Seibert v. Sears, Roebuck & Co. (1975) 45 Cal.App.3d 1, 16, 120 Cal.Rptr. 233 ["the `outstanding balance' of any account is a net total shown to be owed when debits and credits in the account are compared"]; Peoples Finance Etc. Co. v. Bowman (1943) 58 Cal.App.2d 729, 734, 137 P.2d 729 [accounting generally means balancing credits and debits].) "The term `account' involves the idea of debt and credit, and the balance of an account is the result of the debit and credit sides of the account, which constitutes a debt or claim, for which the party in whose favor it exists has the right of recovery." (Millet v. Bradbury (1895) 109 Cal. 170, 173-174, 41 P. 865.)
Collecting a debt unrelated to the bank account, such as a credit card debt, does not implicate the internal balancing of a single bank account. Neither Miller nor his various supporting amici curiae have cited, and we have not found, a single case that interprets Kruger to prohibit a bank from applying a deposit against a negative balance in a single bank account, or towards fees assessed because of that negative balance; indeed, the distinction between that practice and the banker's setoff against an independent account that was of concern in Kruger was observed in a closely related context. In Lopez v. Washington Mut. Bank, FA (9th Cir.2002) 302 F.3d 900, the Ninth Circuit concluded that federal law exempting Social Security benefits from seizure[6] did not prohibit a bank from debiting a customer's account for overdrafts and NSF fees. (Id. at pp. 902-906.) The court expressly distinguished a Tenth Circuit Court of Appeals case holding a credit union could not set off Social Security benefits in a customer's checking account against the customer's obligation to the bank on a separate loan. (Id. at p. 906.) That situation was different, the court observed, because that loan obligation was "a separate, pre-existing debt unrelated to the operation of the depositor's checking account," and there was no indication the depositor had ever consented to pay that debt from his independent checking account. (Ibid., italics added.) This distinction is consistent with the accepted meaning of setoff, which has traditionally been defined to mean a counterdemand "growing out of an independent transaction."[7] (See Black's Law Diet. *232 (8th ed.2004) p. 1404, col. 2.) In fact, the bank agreed during oral argument that imposing charges unrelated to the depositor's checking account is illegal under Kruger.
Our Legislature also indicated that the account balancing practices at issue here are different than the banker's setoff. One year after Kruger was decided, a statute was enacted to impose notice requirements and other restrictions on a bank's right to set off independent debts against a customer's deposit account. Section 864 of the Financial Code[8] requires a bank to give an account holder notice when it exercises any setoff for a debt, and an opportunity for the account holder to claim an exemption if the debt is not owing or the funds are exempt. (§ 864, subds. (c)(1) & (c)(5).) It also prohibits banks from exercising any setoff that would leave less than $1,000 in the customer's account. (§ 864, subds. (b) & (f).) Finally, subdivision (f) allows a bank to debit a deposit account without regard to these restrictions if it obtains the customer's advance written agreement. (§ 864, subd. (f).)[9]
Key, in our view, is that this framework of restrictions on the traditional banker's setoff applies only to independent obligationssuch as the credit card account involved in Kruger; significantly, the statute expressly excludes from its scope "charge[s] for bank services or a debit for uncollected funds or for an overdraft of an account imposed by a bank on a deposit account."[10] (§ 864, subd. (a)(2); see Symonds v. Mercury Savings & Loan Assn. (1990) 225 Cal.App.3d 1458,1464, fn. 1, 275 Cal.Rptr. 871.) Whether section 864 should be read as broadening or narrowing Kruger protections is irrelevant. This different treatment for overdrafts and bank charges signals the Legislature's view that internal account balancing is different from the practice of setting off separate debt against a deposit account, does not implicate *233 the same considerations, and does not warrant the same legal treatment.
There was also considerable testimony that extending Kruger to internal account balancing practices would have adverse consequences not implicated in the context of a traditional banker's setoff. Bank witnesses testified that prohibiting a bank from debiting an account for overdrafts, chargebacks and NSF fees when a customer account contains directly deposited public benefits will cause banks to substantially curtail the services available to such account holders. Consequences might include dishonoring any checks that would overdraw those accounts instead of offering overdraft protection; dishonoring other payment requests, such as automatic bill payments, that could overdraw the account; placing maximum holds on deposited funds; forbidding online or telephone banking; and canceling or restricting account holders' use of ATM and debit cards.
The United States also weighed in on the issue. The Treasury Department expressed similar concerns on behalf of the federal government. According to the Treasury, the injunctive relief would likely cause banks to reduce the range of services available to recipients of government benefits in order to minimize the risk of overdrafts, or cause higher prices for such services, working a significant detriment on both the plaintiff class and the general public interest. Other approaches banks potentially could take to address the increased risk of loss from overdrafts would include requiring account holders to maintain a segregated balance of nonbenefit funds in their accounts or attempting to return direct deposits of benefits that are directed to overdrawn accounts and instead requiring deposit by check. These changes, the Treasury says, would undermine the federal government's goals of affording recipients of public benefits the same consumer protections offered other account holders and encouraging financial institutions to offer electronic banking services, including direct deposit, to individuals who traditionally do not use banks. There is no indication that any such consequences were implicated in Kruger.
Amici curiae dismiss the Bank's predictions of serious consequences for low income customers as self-serving, "sky is falling" exaggeration. As a reviewing court, we acknowledge that it was within the trial court's purview to give such testimony little weight. But that these considerations are debatable, and being debated, is itself an indication that the situation involves complex considerations not present in Kruger. We heed the warning in Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Assn. (1971) 22 Cal. App.3d 303, 311, 99 Cal.Rptr. 417, that deciding whether to extend the rule announced in Kruger to the present context "is better accomplished by statute or by regulation authorized by statute than by ad hoc decisions of the courts. Legislative committees and an administrative officer charged with regulating an industry have better sources of gathering information and assessing its value than do courts in isolated cases." (See also California Grocers Assn. v. Bank of America (1994) 22 Cal.App.4th 205, 218, 27 Cal.Rptr.2d 396.) Different considerations apply to, and different consequences may well flow from, the regulation of the different practices involved in Kruger and this case. In view of those differences, it is not surprising that in the 30 plus years since Kruger was decided, no other court, until now, has construed Kruger to apply to the management of debits and credits within a single account. This is a complex and heavily regulated area more suited to legislative than judicial action so we conclude the trial court erred by finding Kruger governs this significantly different situation. Because *234 that ruling is fundamental to the verdicts on all counts, the judgment is reversed in its entirety.[11]

DISPOSITION
The judgment is reversed. Each party to bear their own costs.
McGUINESS, P.J., and PARRILLI, J., concur.
NOTES
[1] A negative balance is typically caused by honoring a check or debit transaction drawn on insufficient funds (see Cal. U. Com.Code, § 4401, subd. (a)). When an account holder overdraws his or her account, the transaction will generate a debit for the amount of the transaction and an additional debit for the bank's NSF fee. A negative balance may also result, as in the case of Mr. Miller, from a "chargeback," or the bank's reversal of an erroneous credit to an account.
[2] The judgment seems narrower than the broader language appearing in the statement of decision in directing that the Bank is enjoined from representing it has the right to take "NSF fees or other non-bank-fee money claims" (italics added) from directly deposited public benefits. Neither the judgment nor the statement of decision describes the nature of these "non-bank-fee money claims," which could conceivably have been meant to include chargebacks and overdrafts.
[3] The precise scope of the injunction is somewhat ambiguous. Does it encompass account overdrafts? It seems so. But on appeal Miller argues that it does not, emphasizing that the plaintiffs did not seek and were not awarded damages for the Bank's use of public benefit deposits to clear overdrafts, but, "only for the Bank's collection of [NSF] fees and other monetary claims like the collection of debts for erroneous deposits resulting from bank error." In his opposition to the Bank's petition for writ of supersedeas Miller stated clearly that "[n]othing in the judgment precludes the Bank" from clearing overdrafts against Social Security deposit accounts. We will not shift our focus and consider the scope of the injunction to reach only fees, because doing so would be inconsistent with the way Miller tried the case and the way the court decided it. It would fail to take into account the court's instruction to the jury that government benefits "are exempt from collection by the bank for insufficient funds fees ..., overdrafts and money claims"; and its conclusion that the Bank violated the law by "seizing exempt Social Security funds to pay fees and overdrafts allegedly owed to the Bank"; and the jury's finding that the Bank misrepresented that it had the right to use Social Security funds to pay overdrafts. In their reply to supersedeas, plaintiffs characterized the injunction as prohibiting the Bank from exercising a setoff against "NSF fees and overdrafts."
[4] Appearing as amici curiae in support of the Bank are the American Bankers Association, America's Community Bankers, Consumer Bankers Association, Credit Union National Association, Financial Services Roundtable, Independent Community Bankers of America, California Bankers Association, California Credit Union League, and the United States of America. On behalf of the plaintiff class, we have considered amicus curiae briefs from the National Association of Consumer Advocates, The California Attorney General, Center for Responsible Lending, AARP, the National Consumer Law Center, and National Senior Citizens Law Center.
[5] While this practice may be longstanding, it appears to work significant hardship on small depositors. However, its legality and propriety, although raised peripherally in this litigation, are not now before the court.
[6] Title 42 of the United States Code, section 407(a) provides: "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law." (See also 42 U.S.C. § 1383(d)(1) [SSI benefits].)
[7] Nomenclature, of course, is not everything. We emphasize that our analysis does not hinge on whether the challenged practice is referred to as "setoff," "internal account balancing," "seizure," or some other moniker. Indeed, the term "setoff" itself may convey different meanings in different legal and factual contexts. (See generally In re Hancock (Bankr.N.D.Okl.1992) 137 B.R. 835, 839-841.) In the words of Justice Cardozo, "The right of set-off ... is not susceptible of definition in the abstract without reference to the time or occasion of the controversy or the relation of the suit to the primary proceeding ... varying with the needs of the occasion.... [¶] ... When things are called by the same name it is easy for the mind to slide into an assumption that the verbal identity is accompanied in all its sequences by identity of meaning.... [W]e disclaim ... a willingness to put the law into a strait-jacket by subjecting it to a pronouncement of needless generality." (In re Hancock, supra, at pp. 840-841, quoting Lowden v. N.W. National Bank (1936) 298 U.S. 160, 164-166, 56 S.Ct. 696, 80 L.Ed. 1114.) For our purposes today, the significant point is that there exists a conceptual and practical distinction between banking operations carried out within one account and those that involve charging debits and credits between multiple accounts.
[8] Hereinafter section 864. We previously deferred consideration of Miller's unopposed request for judicial notice of the legislative history of section 864. We now grant that request.
[9] The statute expressly does not affect an account holder's right to assert statutory exemptions from levy and attachment, which include the exemption for directly deposited Social Security benefits. (§ 864, subd. (h); see Code Civ. Proc., §§ 703.010, 704.080.)
[10] In full, subdivision (a)(2) of section 864 states: "`Debt' means an interest-bearing obligation or an obligation which by its terms is payable in installments, which has not been reduced to judgment, arising from an extension of credit to a natural person primarily for personal, family, or household purposes, and does not mean a charge for bank services or a debit for uncollected funds or for an overdraft of an account imposed by a bank on a deposit account."
[11] We therefore do not reach issues of federal preemption, the damages award, and the Bank's defense and counterclaim of setoff. Plaintiffs' cross-appeal is mooted by our resolution of the main appeal.