[No. G041034. Fourth Dist., Div. Three. Mar. 18, 2009.]

ALAN S., JR., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MARY T., Real Party in Interest.

## Counsel

Alan S., Jr., in pro. per., for Petitioner.

No appearance for Respondent.

Law Offices of Steven R. Grecco, Steven R. Grecco and Craig A. Darling for Real Party in Interest.

## Opinion

## SILLS, P. J.—

## I. INTRODUCTION

We scheduled an order to show cause (OSC) on father Alan S.'s writ petition challenging two pretrial[1] orders implicating his ability to retain counsel, because his petition presents an important issue regarding access to justice for pro per[2] family law litigants. (See generally *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1369, fn. 20 [63 Cal.Rptr.3d 483, 163 P.3d 160] (*Elkins*) [recommending task force "to study and propose measures to assist trial courts in achieving efficiency and fairness in marital dissolution proceedings and to ensure access to justice for litigants, many of whom are self-represented"].)

The issue, generally framed, is how courts are to achieve, particularly in low and middle income cases, the legislative goal of assuring "*each party* has access to legal representation to preserve each party's rights . . . ." (Fam.

---

[1] Analytically, the two challenged orders are pretrial orders because a major hearing on child custody is coming up. Technically speaking, however, the child custody hearing is itself a postjudgment hearing, because it involves an attempt by petitioner's ex-spouse to change child custody from him to her; the challenged orders were made preparatory to this upcoming hearing.

[2] We use the more common "pro per" for the Latinate "propria persona" throughout this opinion.

Code, § 2030, subd. (a)(1), italics added; see also Fam. Code, § 2032, subd. (b) [goal that *"each party*, to the extent practical, . . . have sufficient financial resources to present the party's case adequately" (italics added)]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2008) ¶ 5:180, p. 5-75 (rev. # 1, 2007) (hereinafter Rutter Group Family Law Treatise) ["Several Family Code statutes authorize pendente lite attorney fee awards in various types of Family Code proceedings. In each case, the purpose is to ensure, to the extent possible, that the litigating parties are on an equal footing in their ability to present their cases . . . ."].[3])

More specifically, Alan challenges two orders made by the trial court preparatory to a child custody hearing brought by his ex-wife, Mary T., which have impacted his own ability to retain counsel. Alan is already paying support for children that were taken away from him by way of a now reversed child custody order. (The upcoming hearing is a product of that reversal, since the trial court, as we explain anon, utilized the wrong standard to gauge whether there had been a change of circumstances.)

The two challenged orders appear to assure that, while Mary is well represented by obviously able and diligent counsel, Alan will be left, like the pro per in *Elkins*, to haplessly flail away. We scheduled this OSC because, in other words, it appeared that the upcoming custody hearing will not be a fair fight with "each party" being able to present its case.

On scrutiny, we have determined that neither of the challenged orders passes muster.

█ The first order is an attorney fee order against Alan and in favor of Mary for $9,000. This order does not pass muster, even under an abuse of discretion standard of review, because, as pointed out in *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866–871 [89 Cal.Rptr.2d 525] (*Keech*) as well as several other cases, the record must reflect that the court did in fact consider the factors set forth in sections 2030 and 2032. Here, however, there are several significant relevant factors that the trial court did not consider, including Alan's negative cash flow of about $800 a month (he ran up a large credit card debt in order to pay a $25,000 attorney fee bill from the time when he was represented), the respective amounts of property owned by the parties (including some horses that Mary owns and apparently rents out and whether either of the parties has any equity in their respective homes), the $1,800 a month in child support that Alan pays to Mary as a result of the now

---

[3] All undesignated statutory references in this opinion are to the Family Code, except for any reference to any section from 1032 to section 1038, which are all to the Code of Civil Procedure. All italics from any quotation from the Rutter Group Family Law Treatise are original to that quotation.

reversed order, new mate or new partner contributions to the respective households (Mary has remarried, Alan lives with a nonmarital partner with whom he recently had a child[4]), and, finally, the incurrence by Mary of at least a quantum of fees clearly not "reasonably necessary" for the litigation to date.

The second order involves a clear error of law on the rather esoteric (and underwritten on) subject of postappeal cost orders. The trial court (incorrectly, as we show below) slashed some $6,000 in appellate costs that Alan had coming to him from a previous (unpublished) appellate proceeding to less than $3,000, and further, also incorrectly, made the cost order payable in installments of $150. Since a postappeal cost order is a money judgment, as distinct from an equitable order to pay money, the trial court had no power to unilaterally make that judgment payable in monthly installments.[5]

Now, one might ask, does not Alan have an adequate remedy at law? After all, both the pendente lite fee order and the order reducing appellate costs are each appealable. No. Not under these particular circumstances. Alan is one pro per litigant who has made it clear he does not want to be in pro per. His objective in filing these writ petitions is to scrape up sufficient money to retain counsel needed to present his case in the upcoming child support proceeding. To borrow a phrase, while all things may not be interrelated, at least in this case Alan's ability to obtain "sufficient financial resources to present [his] case adequately" *is* interrelated with the trial court's pendente lite fee order (which allows his adversary to have a lawyer when he doesn't) and the error on the cost bill (which deprives him of a sum theoretically otherwise available for use as a retainer). And specifically as to the order reducing the appellate costs, $3,000 may be the difference between being able to hire a lawyer and present his side of the story in the upcoming child custody proceeding. The alternative leaves him playing the role of a pro per whose case, shades of Gideon's Trumpet,[6] is doomed from the beginning.

## II. STATEMENT OF THE CASE

### A. The Backstory

Alan and Mary had two children—Thomas, born in 1991, and Sarah, born in 1993. Alan and Mary separated; divorce proceedings were initiated in the

---

[4] Alan told us at oral argument that, given his experience in this litigation, he is reluctant to ever get married again.

[5] And, by way of the equitable principle of what is good for the goose et cetera, on remand the trial court should also consider *Mary's* newfound financial obligation to pay the full amount of Alan's appellate cost bill.

[6] The title of a book by Anthony Lewis, based on the plight of a pro per litigant more fully explained in *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792].

family law court in Orange County in 1995. A final, formal judgment as regards child custody was filed in 1997, which awarded custody of both children *to Alan*. At the time, Alan was a law librarian for a large law firm in Orange County. In 1999, Mary relocated to the area around Reno, Nevada, where she found work as a clerk in family law court in Washoe County. She made no attempt to change custody even though the increased geographical separation of the parents made visitation problematic.

In any event, the two children lived with their father for the next seven years, during which time he found work as a law librarian for a big firm in Century City. However, in 2004 Mary leveled allegations of physical abuse of the children at Alan. The allegations resulted in a petition to establish juvenile court jurisdiction over the children being sustained, based on discrete instances of his having slapped the children.

However, the juvenile dependency court did *not* remove the children from Alan's care. In fact, in preparation for a status review hearing scheduled for January 2006, a social worker wrote that since November 2005, "there has been no safety concerns regarding the children under the care of the father."

Accordingly, on February 9, 2006, the juvenile court terminated jurisdiction. The order of termination in Los Angeles County Juvenile Court case CK56151, specifically stated that: "No custody order is issued."

That meant the termination of juvenile court jurisdiction order left both children in the custody of their father, Alan.

Almost immediately, Mary filed an OSC in Orange County Superior Court family law court seeking a modification of custody based on allegations that Thomas, then about 14 years old, did not want to live with his father. She also filed ex parte papers in what was basically her own home court (in more than one sense of the word), the Nevada court where she sought a change of custody based on the same allegations. The Nevada court, however, declined to grant Mary's ex parte request, in part because a hearing was already scheduled in California for a few weeks later in April.

In April, the Orange County family law court, Judge Naughton presiding, granted temporary change of custody to Mary. At this point, Alan was in pro per.

About a week later Alan would unsuccessfully move to recuse Judge Naughton for cause based on his having had a telephone conversation with a Nevada judge concerning Mary's unsuccessful ex parte application in Nevada. Judge Naughton noted that it was "good judicial practice" under the Uniform Child Custody Jurisdiction and Enforcement Act (§ 3400 et seq.) for judges in courts outside the jurisdiction to communicate with each other. (By the way, Judge Naughton was wholly correct in talking to the Nevada judge. (See *Guardianship of Donaldson* (1986) 178 Cal.App.3d 477, 491 [223 Cal.Rptr. 707] ["The resolution of jurisdictional conflict between two states by direct interstate judicial communication and consultation is not discretionary; it is mandatory."].))

Judge Naughton's April 2006 order was temporary, but it was not until January 2007 that the custody change would eventually be heard,[7] and one should note the obvious: Given the time lapse, Mary now had the de facto status quo going for her even though, technically, it was her OSC to change custody from him to her. For some reason Judge Naughton did not hear the case; rather it was assigned to Judge Monarch, an experienced family law judge who had recently retired. For the hearing, Alan was able to retain counsel (to whom he would eventually pay $25,000). Mary was represented by her current counsel.

The hearing lasted two full days. Alan's retained counsel managed to place the issue of what is the proper standard in a family law child custody proceeding in the wake of a juvenile court exit order properly before Judge Monarch: Is the proper standard any change of circumstances since the exit order, or is it simply the best interest of the child ab initio, as would be the case if the court were tending to the initial dissolution? Judge Monarch recognized that "it's an area I'm not clear on" and took the matter under submission.

The statement of decision adopted the model that the case turned on whether there had been a significant change in material circumstances *since*

---

[7] Just a week prior to oral argument in this case, for example, Judge Francisco Firmat, the supervising judge of the Orange County Superior Court family law panel (which is essentially ground zero for the history of this case) publicly spoke out, in what we think is not only a perceptive but courageous article, as to why conditions in family law courts are the way they are. (See Firmat, *What the Family Law Courts Need Even More Than Resources: Leaders*, L.A. Daily J. (Feb. 10, 2009) p. 6 (hereinafter, Firmat Family Court Leadership Article).) One of Judge Firmat's observations was that family law matters in Orange County are often tried in bits and pieces over too long a period of time, to the detriment of the parties: Speaking of dissolution trials (though the thought readily applies to postjudgment custody battles as well), Judge Firmat notes that "when the dissolution finally gets to trial, it is too often tried in a half a dozen afternoons over a period of weeks or months, with the delays costing the parties tens of thousands of dollars in additional attorney fees."

*the February 1997 final family law court judgment,* as distinct from the *2006 juvenile court exit order.* Using that standard, the trial judge changed primary physical custody of both Thomas and Sarah to Mary, in particular noting, "the pattern of discipline imposed by" Alan "[f]rom and after February, 1997" but only referenced son Thomas. As to Sarah, the statement of decision said that she had "suffered extreme emotional distress" having "witnessed the toxic relationship being developed and maintained between" father and son.

Alan, representing himself in pro per, appealed the order.[8] This court, in an unpublished opinion (*In re Marriage of Alan S. & Mary T.* (May 12, 2008, G039262) [nonpub. opn.]) reversed the decision to award custody to Mary because the trial judge, as a matter of law, had used the wrong standard to gauge whether there had been a material change of circumstances. The case of *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96 [44 Cal.Rptr.3d 388], construing the 2000 enactment of subdivision (d) to section 302 of the Welfare and Institutions Code, had made it reasonably clear that the proper standard in our case would be *change of circumstances since the juvenile dependency court's exit order,* not change of circumstances since the 1997 initial award of custody to Alan.[9] The change-of-custody order had to be reversed, and the case was sent back to the trial court for application of the proper standard.

### B. The Skirmishing Prior to the Remanded Custody Hearing

#### 1. *Alan Tries to Recover Costs from His Successful Appeal*

We are required at this point in the narrative to make a quick digression on the theme of discontinuity in the family law courts, a theme on which this court has had a number of occasions to write. (E.g., *Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672 [40 Cal.Rptr.3d 509] [trial judge needlessly declared mistrial of dissolution simply because she was being reassigned to a next-door domestic violence calendar, thus costing parties thousands of dollars in extra attorney fees]; *In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 809 [81 Cal.Rptr.2d 797] ["Not counting Judges Stock,

---

[8] A portion of the opinion was devoted to establishing that Alan's appeal was, indeed, timely.

[9] We also observed that there was nothing in the record to substantiate the change of custody (e.g., the daughter's suffering as a result of being a bystander in the "toxic" father-son relationship), and noted that it appeared a disservice to the daughter to have changed custody. Those observations, however, were only tentative, and we left the ultimate determination to the trial judge on remand. In this (writ) proceeding, Alan has tried to get this court to take judicial notice of a decline in Sarah's behavior and grades since the custody change. Such evidence, of course, is strictly a matter for the trial court when the merits of the custody matter are heard.

Didier and Hutson, who routinely approved stipulations, this case has passed from Rutter to Cox to Knox to Smallwood to Mandel to Woolley to Posey. And not one of these judges ever heard more than one of Ida's modification requests!"].) It is a theme apparently understood in the Orange County family law department,[10] but, as the facts in this case show, the problem persists.

In this case, the first six hearings right after our previous opinion was handed down in spring 2008 were conducted by Judge Clay Smith. (These hearings took place in the period late May 2008 through mid-July 2008.) After these six hearings, beginning July 25, 2008, Judge Nancy Pollard conducted most of the hearings, though Judge Smith still conducted four hearings since July 25, 2008. Why the case went from Judge Smith to Judge Monarch is not apparent from the record, and why the case went, for a period, back and forth between Judge Pollard and Judge Smith is not apparent from the record furnished us in this proceeding. Meanwhile, what happened to Judge Monarch? It appears that he was disqualified on remand by Alan. (See Code Civ. Proc., § 170.6, subd. (a)(2) ["A motion under this paragraph may be made following reversal on appeal of a trial court's decision . . . ."].)

In any event, while few pro pers ever prevail on appeal, Alan had beaten the odds. Then again, while Mary had had counsel in her victory at the trial level, she had elected to proceed in pro per herself at the appellate level, so Alan's victory on appeal wasn't as if Alan had prevailed against an adversary with counsel. In the wake of remand, Mary retained counsel. After all, given the disparity in the parties' respective incomes her counsel would likely be able to obtain an attorney fee award against Alan (more on that below). For his part, Alan began looking for money to retain counsel for himself.

His first effort is the subject of the unpublished companion opinion to this one (*A.S. v. Superior Court* (Mar. 18, 2009, G040870) [nonpub. opn.]).[11] Essentially, Alan tried to recover some $3,500 in an attorney fee order also contained in the previously challenged change of custody order. As we explain in the companion opinion, Alan's failure to challenge the attorney fee order in his prior appeal precluded his later challenge to it in a "motion for restitution" after the appeal. So the trial court properly denied his "motion for restitution."

---

[10] Judge Firmat's perceptive article (see fn. 8, *ante*) laments the culture of rotation in urban family law departments, where judges with little, or no, family law experience circle in and out with little continuity for the litigants. He says: "Historically, governors have shown a bias that favors civil and criminal practitioners on the bench. Very, very few attorneys who practice family law, juvenile or probate are appointed. Judges typically cycle into a family law assignment for three-year tours of duty but most return to spend the rest of their career in civil or criminal assignments. And so we have an absence of continuity and leadership in family law." (Firmat Family Court Leadership Article, *supra*, at p. 6.)

[11] Unpublished because it deals with an issue sufficiently settled not to warrant publication.

But Alan had another possibility to scrape up money for an attorney of his own—recover his costs from the previous appeal. On July 24, 2008, Alan filed a memorandum of costs on appeal (Judicial Council of Cal., form MC-013 (rev. Jan. 1, 2007)) for $5,915.81. Mary filed, on July 31, 2008, a series of "objections" to each item of Alan's memorandum of costs, each repeating the statement that "Petitioner has not provided any documentation to evidence this expenditure." *No other ground of objection was made at that time.*

On August 20, Alan responded with a declaration contending that Mary had missed the deadline for moving to strike or tax costs.

His argument went like this: Under California Rules of Court, rule 8.278(c)(1), he had 40 days from the remittitur issued July 16, 2008, to file a memorandum of costs on appeal. He easily met that deadline with his filing of the memorandum of costs less than 10 days after the remittitur, on July 24. (Subd. (c)(1) of rule 8.278 of the Cal. Rules of Court provides: "Within 40 days after the clerk sends notice of issuance of the remittitur, a party claiming costs awarded by a reviewing court must serve and file in the superior court a verified memorandum of costs under rule 3.1700.")[12]

Thus, under rule 8.278(c)(2), the burden shifted to Mary to file a motion to strike or tax costs "in the manner required" by rule 3.1700. (Subd. (c)(2) of rule 8.278 provides: "A party may serve and file a motion in the superior court to strike or tax costs claimed under (1) in the manner required by rule 3.1700.")

And, under rule 3.1700, Mary had 15 days plus time for mailing to file a motion to strike or tax costs from service of the cost memorandum. (Rule 3.1700(b)(1) provides: "(1) *Striking and taxing costs* [¶] Any notice of motion to strike or to tax costs must be served and filed 15 days after service of the cost memorandum. If the cost memorandum was served by mail, the period is extended as provided in Code of Civil Procedure section 1013.") Thus the time to move to strike or tax costs had clearly expired.

Alan also included in his August 20 declaration photocopies of checks and other receipts documenting the expenditures in his appellate cost bill.

■ Mary did not file a document using the words "strike/tax costs bill" until September 2, 2008. In that memorandum, Mary sought to strike $2,925.81 from the roughly $5,900 original appellate cost bill, relying *solely* on section 1033.5 of the Code of Civil Procedure, and most significantly on

---

[12] All further references to a rule of court are to the California Rules of Court.

subdivision (c)(2) of section 1033.5, which allows costs only "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation."

The statute was important for Mary's argument, we must point out now, as regards two specific sets of items in Alan's appellate cost bill:

First, if our math is correct, Mary objected to $1,165 incurred by Alan for reporter's transcripts included in the record in his prior appeal on the ground that under subdivision (c)(2) of section 1033.5 of the Code of Civil Procedure, those particular transcripts were not "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation." The argument was that since Alan had only targeted Judge Monarch's January 2007 child custody change-of-circumstances hearing on his appeal, any reporter's transcripts outside of that hearing were not "reasonably necessary to the conduct of the litigation."

Second, Mary also objected to $150 that included part of the filing fee for Alan's reply brief, on the theory that it was "not allowable under" Code of Civil Procedure section 1033.5 et seq. Mary's paperwork did not explain further the basis of this objection, but it appears that she was referring to the binding and color coding of the reply brief in the previous appeal, as well as the filing fee, since binding of briefs is not an item mentioned in the list of 13 allowable cost categories under Code of Civil Procedure section 1033.5, subdivision (a)(1) through (13). (There's a reason for that, as we shall soon see.)

In contrast to Mary's memorandum, which relied solely on Code of Civil Procedure section 1033.5, Alan's reply cited the Rules of Court (including 8.278 and 3.1700) specifically governing costs on appeal.

Judge Pollard, in a hearing on September 16, 2008, stripped all $2,925.81 from the cost bill as requested by Mary. Judge Pollard also made the order payable in installments at the rate of $150 a month.

### 2. *Mary Goes for an Attorney Fee Award*

In preparation for the remanded hearing, Mary sought pendente lite attorney fees, essentially based on the nominal income disparity between her and Alan. As we said, Alan is a law librarian at a big firm in Century City.[13] According to his income and expense declaration, he makes $8,333.33 per

---

[13] There is no need to mention the firm. However, a quick check of its Web site reveals that family law is conspicuously *not* among its practice groups.

month gross before taxes. Mary works as a family court clerk in Reno, Nevada, making $5,135 per month before taxes. (These are certainly *not* all the facts bearing on the "circumstances" of the parties as regards a proper equalization of attorney resources. We shall deal with other circumstances when we reach the merits of Alan's challenge in pt. III.A.2. of this opinion, below.)

On September 16, the trial court awarded $9,000 in attorney fees made payable from Alan to Mary, at the rate of $300 per month.

### 3. *This Writ of Mandate Proceeding*

About three weeks later, on October 7, 2008, Alan filed, still in pro per, this petition for writ of mandate (G041034) challenging both the trial court's orders of September 16 (1) reducing his costs of appeal by about $3,000 as well as (2) awarding $9,000 in attorney fees against him. Because both issues went to the issue of whether Alan would be able to afford a lawyer to present his side of the story in the upcoming hearing on child custody, this court granted a request to stay all proceedings pending our determination of the writ petition. We subsequently requested a formal response from Mary and, pursuant to an OSC, scheduled oral argument on Alan's petition.

### III. THE MERITS

### A. The Pendente Lite Fee Order

### 1. *No Adequate Remedy by Way of Appeal*

One might say, offhand, that since a pendente lite attorney fee order is a classic instance of a "collateral matter," it is appealable and this court should exercise its discretion to decline review. But, as we have noted, everywhere Alan turned after remand resulted in an order making it difficult, and perhaps impossible, to hire a lawyer.

We need only point out that, of all issues, child custody is perhaps the most time-sensitive (and hence least amenable to an adequate remedy by way of appeal) since time in a child's life can never be recovered. (See *Zenide v. Superior Court* (1994) 22 Cal.App.4th 1287, 1293 [27 Cal.Rptr.2d 703] [even though order was appealable as collateral matter, appeal was not adequate remedy because children had been deprived of contact with one parent for about three years and it was "imperative that this matter be resolved as expeditiously as possible"].) Indeed, if an order involving a bad relationship between a motorcycle dealer and a motorcycle manufacturer requires writ

relief because the passage of time in that relationship cannot be recovered (see *Kawasaki Motors Corp. v. Superior Court* (2000) 85 Cal.App.4th 200, 205–206 [101 Cal.Rptr.2d 863]), a fortiori the upcoming custody hearing should be conducted under the fairest possible circumstances. Here, because of the interrelationship between the order and Alan's ability to obtain counsel for the main event, and the fact that no appeal would be decided prior to that event (the upcoming child custody hearing) we deem the normal (slow) appellate procedure to be inadequate.

### 2. *The Statutory Need to Consider the Relevant Circumstances*

#### a. The $9,000 Order

■ Statutory authority for pendente lite attorney fee orders in family law cases is found in Family Code section 2030.[14] Section 2030 applies to orders pending postjudgment matters, such as change-of-custody proceedings, just as much as it applies to litigation leading up to the initial trial of the family law case.

It may be a little surprising to some, but the purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength. (See *Keech, supra,* 75 Cal.App.4th at p. 866 [" ' "California's public policy in favor of expeditious and final resolution of marital dissolution actions is best accomplished by providing at the outset of litigation, consistent with the financial circumstances of the parties, a parity between spouses

---

[14] Here is the complete text of section 2030, subdivision (a):

"(a)(1) In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.

"(2) Whether one party shall be ordered to pay attorney's fees and costs for another party, and what amount shall be paid, shall be determined based upon, (A) the respective incomes and needs of the parties, and (B) any factors affecting the parties' respective abilities to pay. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."

in their ability to obtain effective legal representation." ' " (Quoting *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 41, fn. 12 [283 Cal.Rptr. 584, 812 P.2d 931])].)

That preference for parity is expressed in both subdivision (a)(1) of section 2030, with its statement of purpose that "the court shall ensure that *each party* has access to legal representation to preserve each party's rights . . ." (italics added), and in a companion statute, section 2032, subdivision (b), which announces the goal of enabling "*each party*, to the extent practical, to have sufficient financial resources to present the party's case adequately." (Italics added.)[15]

However, by providing for orders to pay money so that one's adversary can afford an attorney, there is the paradoxical possibility that a court may effectively deprive the paying party of the ability to present his or her own case. That actually happened in *Keech, supra*, 75 Cal.App.4th at pages 866–871, which, despite an abuse of discretion standard of review, reversed a pendente lite attorney and accountant fee order for that very reason.

In *Keech*, a pendente lite fee order required the husband to pay fees at $500 a month, leaving him a total of $593 a month to live on. The appellate court reversed the order, in a case where the husband's gross monthly income was $5,405, his support payments were $1,468 a month, and his taxes and rent took up the balance beyond the $593. (*Keech, supra*, 75 Cal.App.4th at p. 867.) In short, he had nothing left to pay for fees for himself.

The appellate court in *Keech* specifically noted the absence of any "consideration" for the husband's needs to pay his own fees. Said the court: "As to the prospective $500 monthly payments of wife's attorney fees, while it could perhaps be argued that leaving husband $593 a month after court-ordered obligations, taxes and rent *might* be equitable under the parties' strained circumstances, the record does not sufficiently reflect, for example, any

---

[15] Here is the complete text of section 2032, subdivisions (a) and (b):

"(a) The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.

"(b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

consideration of the husband's needs to pay his *own* outstanding legal fees during that period. Yet the court in making the order was required to 'take into consideration the need for the award to enable *each* party, to the extent practical, to have sufficient financial resources to present the party's case adequately.' (§ 2032, subd. (b).)" (*Keech, supra*, 75 Cal.App.4th at p. 868, original italics.)

■ A word on the "expense" side of income and expense declarations is now in order. Since expenses are (with very few exceptions, e.g., § 4071), irrelevant for *child support*, it is perhaps too easy for family law judges to dismiss the expenses on the income and expense declaration in other contexts, such as here, in the context of a requested pendente lite attorney fee order.

But to do so is error. Expenses *are* relevant to pendente lite attorney fee orders. Section 2032, subdivision (b), states that "the court *shall* take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320." (Italics added.)

Section 4320 presents a near-exhaustive list of factors that are to go into a spousal support award, and a party's expenses (under the headings of "obligations and assets") are among them. (§ 4320, subd. (e); see also subd. (k) ["balance of the hardships to each party"].) To be sure, not all section 4320 factors will be relevant all the time (hence the "to the extent relevant" language in § 2032). But obviously a number of section 4320 factors will *usually* bear on a pendente lite fee order. These surely include earning capacity (subd. (a)); ability to pay, taking into account such things as assets and standard of living (subd. (c)); respective needs (subd. (d)); obligations and assets (subd. (e)); age and health (subd. (h)); and the overall balance of hardships (subd. (k)).[16]

■ Section 2032, subdivision (b) further tells courts that: "Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

---

[16] Here is the complete text of section 4320:

"In ordering spousal support under this part, the court shall consider all of the following circumstances:

"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:

"(1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training

Reading section 2032 together with section 4320, one cannot escape the idea that a pendente lite fee award should be the product of a nuanced process in which the trial court should try to get the "big picture" of the case, i.e., "the relative circumstances of the respective parties" as the statute puts it. (§ 2032, subd. (a).) Conversely, determination of a pendente lite attorney fee order is definitely not a truncated process where the trial court simply (a) ascertains which party has the higher nominal income relative to the other, and then (b) massages the fee request of the lesser-income party into some manageable amount that feels like it will pass an abuse of discretion test.

■ While no particular language is required in an order awarding attorney fees under sections 2030 and 2032, the record (including, but not limited to, the order itself), must reflect an actual exercise of discretion and a consideration of the statutory factors in the exercise of that discretion. (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 315 [111 Cal.Rptr.2d 755] [" 'the record must reflect that the trial court actually exercised' " its discretion in " 'fashioning a need-based fee award' "]; *In re Marriage of*

to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.

"(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.

"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.

"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d) The needs of each party based on the standard of living established during the marriage.

"(e) The obligations and assets, including the separate property, of each party.

"(f) The duration of the marriage.

"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.

"(h) The age and health of the parties.

"(i) Documented evidence of any history of domestic violence, as defined in Section 6211, between the parties, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party.

"(j) The immediate and specific tax consequences to each party.

"(k) The balance of the hardships to each party.

"(*l*) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties.

"(m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4325.

"(n) Any other factors the court determines are just and equitable."

*Braud* (1996) 45 Cal.App.4th 797, 827 [53 Cal.Rptr.2d 179] [source of quote from *Cheriton*]; *In re Marriage of Lynn* (2002) 101 Cal.App.4th 120, 133–134 [123 Cal.Rptr.2d 611] [quoting *Cheriton* and reversing because trial court "failed to consider the appropriate statutory factors in determining" how much payor spouse should pay each month].)

▮ In the present case, however, the trial court took the truncated approach, and the record certainly does not show consideration of any number of the relevant factors bearing on this case. These include: Alan's $800-plus-a-month deficit, apparently financed by credit cards (cf. § 4320, subds. (a), (c), (e)); the total assets of the parties, including whether either of them has any equity in the houses in which they currently live (cf. § 4320, subds. (c), (e)); the inability of Alan to be able to afford to see his children (he hasn't seen them since Judge Monarch made the order switching custody—talk about balance of hardships); the apparent fact that Alan had already spent all of his liquid assets ($25,000) on an attorney; Alan's $1,800 a month child support payments; and the new mate or "significant other" income of each party. (Mary has a new spouse, Alan has a nonmarital partner.) We should add here that while new mate or partner income is generally irrelevant in child support matters (see § 4057.5, subd. (a)(2)), it is *not* statutorily irrelevant in pendente lite fee orders. (New mate income usually doesn't come up in spousal support matters because most support awards end on remarriage. But it does come up when an ex-spouse cohabits with someone, and in that context it is relevant; see *In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1298 [51 Cal.Rptr.3d 234] [relevant because of possible economies of scale].) The expansive language of section 2032—the "relevant circumstances of the respective parties"—also shows it is certainly relevant for fee awards.

Further, and with a nod to section 2032, subdivision (b)'s admonition that financial resources are only "one factor" for consideration, there is in the case before us a strong indication that Mary has incurred fees that were not reasonably necessary. (See Rutter Group Family Law Treatise, *supra*, ¶ 5:184.1, pp. 5-79 to 5-80 (rev. # 1, 2007) ["Although application of the relative circumstances standard (above) may warrant a pendente lite fees and costs award, the *amount* is limited by a '*reasonably necessary*' standard (Fam.C. § 2030(a), ¶ 5:182). An award measured summarily by what the applicant has been billed or what his or her attorney is presently owed is an *abuse of discretion* if it does not reflect consideration of whether the fees allegedly incurred were reasonably necessary."].)

The clearest instance of unreasonable overlitigation happened right under the eyes of this court. When Alan filed his first writ (G040870), this court

asked for a simple "informal response." What we got was a bit more than "informal": a red-cover-bound, 24-page, very formal and quite polished opposition.

Another instance was the opposition to a hardship deduction based on the recent birth of Alan's daughter. The hardship deduction took *four hearings*.

Thus it is not surprising that, at the September 16 hearing for pendente lite attorney fees, Mary's counsel asked for a grossly unconscionable $35,000 attorney fee order, presumably on the theory that there was no harm in asking for an inflated sum that would inevitably be reduced; open with an outrageous offer, as some negotiators are wont to do.

There was, in short, much the trial court should have explored, but did not.

Which leads us to the issue of the *"Reiflerization"*[17] of the hearing. That is, Mary's OSC for expenses was heard without any testimony, strictly on declarations (pretty much only the income and expense declarations). To be sure, Alan certainly indicated a desire to call Mary to the stand to ask her questions about her earning capacity,[18] but the issue got sidetracked in his hapless pro per sort of way.[19] Apparently finding the attempt to call Mary to the stand futile, Alan also sought to call her attorney in an effort to explore the issue of Mary's income by other means, and that effort was rejected.[20] The bottom line is that no live testimony was taken and the matter was decided strictly on the income and expense declarations.

---

[17] After *Reifler v. Superior Court* (1974) 39 Cal.App.3d 479 [114 Cal.Rptr. 356], generally acknowledged as the granddaddy of the line of cases allowing a trial court to exclude live testimony in family law OSC's and motions. There is an irony in the *Reifler* decision itself which will become important in about four more paragraphs of the text.

[18] "THE COURT: Thank you.

"Mr. S[.], you wish to be heard?

"MR. S[.]: Yes, Your Honor. I would also like to call the Respondent to the stand if I could. . . . [Referring to prior hearing.] The Respondent perjured herself on the stand, said she had her hours cut . . . . "

[19] His request apparently got lost in an extended (and fruitless) colloquy with the trial judge over his hardship deduction:

"THE COURT: All right. And I want to hear the rest of your argument, Mr. S[.]. Did you say you wanted to call Mrs.—

"MR. [S.]: I'm confused, Your Honor. Did you read in there that the hardship deduction was granted."

Then followed some discussion about whether Mary had reduced her working hours as it related to the previous hardship deduction hearings.

[20] After the court stated that it found no reference to Mary having reduced her hours, Alan tried to cross-examine her attorney on the issue:

"MR. [S.]: Well, Your Honor, then I would request that [name of Mary's trial attorney] be called to the stand so that I can give him direct examination.

"THE COURT: Request is denied. Now continue with your argument, Mr. [S.]."

The recent *Elkins* case dealt with a similar problem of live testimony as distinct from proceeding solely on declarations. In *Elkins*, a local rule of the Contra Costa Superior Court pretty much made it impossible for family law litigants to present oral testimony in the trials of family law matters. The rule had a particularly devastating impact on a pro per litigant in that case, who found himself practically defaulted, unable to present his case with oral testimony, and the result was a division of property "substantially reflecting" his adversary's proposed order. (See *Elkins, supra,* 41 Cal.4th at p. 1350.) Our Supreme Court had no trouble striking down the local rule, sending the case back for a redo so that the pro per might actually be able to introduce admissible evidence, as distinct from the hearsay of declarations.

There is much that the present case has in common with *Elkins*. Both cases center on a pro per haplessly bumbling through his own litigation. But there is one difference: The *Elkins* court took some pains (e.g., *Elkins, supra,* 41 Cal.4th at pp. 1355 [noting statutory exception to hearsay rule for motion matters], 1362–1363 [distinguishing motions from trials], 1363 [noting established distinction "between hearings at which a judgment is entered, and hearings on postjudgment motions"]) to confine its holding to family law *trials,* as distinct from OSC's or motions.[21] Technically, the trial court was not, unlike the situation in *Elkins, required* to take oral evidence.

But just because live testimony may not be automatically required does not mean it may not be an abuse of discretion to refuse it if the peculiar facts of a given case require it.

Ironically—ironic since the usual idea that family courts can dispense with live testimony tends to be synonymous with the name of the *Reifler* case—the original *Reifler* case made it quite clear, even as regards a motion or an OSC, that an a priori preclusion of oral testimony is an abuse of discretion, and will result in a reversal with directions to do it again with live testimony. The actual facts of *Reifler* were that a group of postjudgment motions and OSC's were before the trial court, and the trial court told the parties that, pursuant to local court policy, the parties had the option of keeping trial time down to only one day or just submitting on the moving papers. (*Reifler, supra,* 39 Cal.App.3d at p. 482.) Then the trial court dared counsel for the wife to test the local court policy by writ petition. She accepted (*id.* at p. 483), and the result was an opinion holding that reliance upon the local policy, rather than an intelligent application of trial court discretion, *was error,* and in fact the case was sent back to hear oral testimony (*id.* at p. 485).

---

[21] Any distinction between OSC's and motions in the family law context (see generally Rutter Group Family Law Treatise, *supra,* ¶¶ 5:291–5:300, pp. 5-118 to 5-120) is not relevant for purposes of the explication of *Elkins*.

We apply the actual rule from *Reifler* to the writ proceeding before us. We cannot forget the statutory nature of the present case. Under sections 2030 and 2032, a pendente lite fee order requires, as we have explained, a coming to grips by the trial court with the totality of circumstances bearing on a fee order, not just a quick ascertainment of whose income is higher (the "only one factor" language from § 2032). Perhaps a court can indeed get the big picture on papers alone. But in any event that didn't happen here. In a case of so many unanswered questions—e.g., don't either of the parties have any equity in their homes? what is Alan living on? why is there no money for visitation with the children; what is the true nature of Mary's finances? is she really renting out horses? were four hearings on the hardship deduction really necessary?—this was not the case to proceed on an unwritten policy of papers alone.

Of course, we must hasten to add that not all pendente lite fee requests require oral testimony. (See *Elkins, supra,* 41 Cal.4th at p. 1355 [noting that § 2009 of Code Civ. Proc. "permits courts to rely upon affidavits in certain motion matters"].) This particular case before us, however, does, because of the multitude of unaddressed factors in the context of a contemplated hearing in the wake of a reversal of a child custody order. Per *Keech,* we must send this case back for a reconsideration of the basic circumstances of the parties. Per *Reifler,* we send it back for reconsideration taking live testimony.

### b. The $300 Monthly Installments

The case must therefore go back for a redo, one where the trial court can get a bigger picture of this litigation. We can observe, however, that making the fee order payable in $300 installments *seems,* on first impression on this admittedly incomplete record, reasonable under the circumstances. (Cf. *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 531–532 [70 Cal.Rptr.2d 488] [approving total fee order but holding that making it payable all at once was abuse of discretion]; Rutter Group Family Law Treatise, *supra,* ¶ 5:184.2, p. 5-80 (rev. # 1, 2007) ["The *total* amount of a fee-shifting order may be appropriate in light of the parties' 'relative circumstances' (parties' income disparities and obligor's greater earning capacity, etc.), yet an abuse of discretion if the *timing or method* of the payment obligation (whether lump-sum or by installments) puts an unreasonable burden on the obligor in light of his or her own cash-flow situation (support obligations, personal living expenses, and own attorney fees."].)

However, we stress that because of the statutory requirement of sections 2030 and 2032 to get the big picture, what *seems* reasonable on an incomplete record may not be so reasonable on a complete one.

### B. The Reduction of Appellate Costs

#### 1. *No Adequate Remedy by Way of Appeal*

From the record we do have, it appears that whatever money Alan had to spend on an attorney was spent at the first hearing, which resulted in his paying $25,000 to his previous attorney. There is, however, the $3,000 that the trial court cut from his appellate costs, an amount that might at least serve as the basis for a retainer. Since the statutory goal is that each party have representation, we address the issue of that $3,000 as integral to the question of whether Alan can obtain representation at the upcoming child custody hearing.

#### 2. *A Rather Esoteric Problem Concerning Appellate Costs*

Statutory authority for the award of costs after litigation is found in sections 1032 through 1038 of the Code of Civil Procedure. The context of section 1032—using language that speaks of plaintiffs, defendants and prevailing parties being those with a "net monetary recovery"—implies that the statute is directed at the trial court. So does the context of section 1033, with its reference to a party recovering a judgment. Section 1033.5, which is a list of what is, and is not, allowable as a cost, similarly is trial-court-oriented, with items exclusively related to trial proceedings (e.g., references to jury fees, taking depositions, process servers, etc.). It was section 1033.5 on which Mary entirely relied in filing her September 2 motion to strike/tax costs. Indeed, as noted, the most obvious "appellate cost"—the filing of briefs—is not mentioned at all in section 1033.5.

Thus the very language and context of Code of Civil Procedure section 1033.5 indicates that it does not govern costs on appeal.

Moreover, another statute—Code of Civil Procedure section 1034, subdivision (b)—tells us specifically what law governs costs on appeal. It is the law set forth in the California Rules of Court: Section 1034, subdivision (b) states: "The Judicial Council shall establish by rule allowable costs on appeal and the procedure for claiming *those costs*." (Italics added.)

In short, Code of Civil Procedure section 1033.5 with its list of what is "allowable as costs" and the procedure for claiming or opposing them is not where we should look. Under section 1034, subdivision (b) we look to the rules of court. Thus Mary's main argument, namely that the trial court had the power to strike costs "forbidden by statute" (with its minor premise that appellate costs not "necessary" to the appeal are forbidden by statute, even if those costs are specifically included in rule 8.278(d)(1)) is not persuasive.

Rule 8.278 is the rule directly governing costs on appeal, and it directs the reader to the procedure set out in rule 3.1700 for obtaining or resisting costs on appeal. Rule 3.1700(b)(1) is clear that a party resisting a memorandum of costs must file a motion to strike or tax costs within 15 days of the filing of the memorandum of costs. In fact, rule 3.1700(b)(4) provides that "After the time has passed for a motion to strike or tax costs or for determination of that motion, the clerk *must* immediately enter the costs on the judgment." (Italics added.) There is not a lot of forgiveness for missing the deadline there.

Clearly, Mary allowed the 15-day deadline in rule 3.1700 to elapse unless we were to deem her "objections" filed on July 31, 2008, to be the equivalent of a motion to strike or tax costs under rule 3.1700(b)(1).

Which, under the rule that substance trumps form, we should indeed do. We may treat Mary's objections, filed July 31, 2008, as a motion to tax costs; indeed, each item in her objections filed July 31, 2008, corresponded to each successive line of Alan's cost memorandum. Authority for such treatment is found is rule 3.1700(b)(2), which governs the *"Form of motion."* This rule provides for such seriatim objections as Mary filed: "(2) *Form of motion* [¶] Unless objection is made to the entire cost memorandum, the motion to strike or tax costs must refer to each item objected to by the same number and appear in the same order as the corresponding cost item claimed on the memorandum of costs and must state why the item is objectionable."

We thus conclude that Mary's memorandum of July 31, 2008, quacked enough like a duck to be classified as a motion to strike or tax costs.

But that does not end the analysis of whether the trial court's reduction of Alan's memorandum of costs by $3,000 was correct. The *sole* basis for each of the objections filed July 31 was lack of documentation.

The issue of lack of documentation for appellate costs, however, was dealt with in *Bach v. County of Butte* (1989) 215 Cal.App.3d 294 [263 Cal.Rptr. 565], where the court said that documentation is not necessary to submission of a memorandum of costs on appeal: "There was no requirement that copies of bills, invoices, statements or any other such documents be

attached to the memorandum as the Bachs have erroneously suggested. To the contrary, a properly verified memorandum of costs is considered prima facie evidence that the costs listed in the memorandum were necessarily incurred. [Citation.] Documentation must be submitted only when a party dissatisfied with the costs claimed in the memorandum challenges them by filing a motion to tax costs." (*Id.* at p. 308.)

Thus, under *Bach*, Mary properly challenged the veracity of Alan's memorandum of appellate costs, *but nothing else*. And Alan met that challenge with subsequent documentation. Thus the trial court thereafter did not find that Alan's costs were not really incurred.

Rather, the trial court relied on assertions of error under Code of Civil Procedure section 1033.5 made in Mary's *September 2, 2008* memorandum.

And that itself was error, in at least two ways. First, the September 2, 2008 memorandum was clearly untimely. Considering it effectively gave Mary considerably more time than the California Rules of Court allowed her to file a motion to strike or tax costs. In that regard, we think it would be intellectually dishonest to consider Mary's untimely September 2, 2008 memorandum as a mere "amendment" of her timely July 31, 2008 memorandum. The grounds in the September 2, 2008 memorandum were wholly distinct and independent of the grounds in the July 31, 2008 memorandum. Any other result would allow a party merely to file a piece of paper within the rule 3.1700(b)(1) deadline, and, no matter how frivolous the ground of objection, cure it at its leisure.[22]

Second, as we have seen, Code of Civil Procedure section 1033.5 is a trial court rule, and should be confined to the trial court context, so the trial court's reliance on section 1033.5, subdivision (c)(2) was misplaced. Rule 8.278(d)(1), in direct contrast to section 1033.5, subdivision (c)(2), makes no reference to necessity as a fact in what part of the appellate record is recoverable as a cost. The rule says, "The amount the party paid for any portion of the record," which suggests that, indeed, "any portion" of the record is recoverable. (Rule 8.278(d)(1).) (The exception is: "The cost to copy parts of a prior record" and there was no "prior record" in this case.)

This reading of rule 8.278(d)(1) makes particular sense when one realizes that the sanctions for including unnecessary material in the appellate record are specifically committed to the *appellate* court, *on its motion or a*

---

[22] Indeed, in her formal response in this writ proceeding, Mary's counsel takes issue with a number of costs that do not appear to have been objected to at the trial level, neither in the timely July 31, 2008 memorandum nor in the untimely September 2, 2008 memorandum. The argument that those costs are improper has thus been waived twice-fold.

*motion of a party in the appellate court.* Rule 8.276(a) provides: "On motion of a party or its own motion, a Court of Appeal may impose sanctions, including the award or denial of costs under rule 8.278, on a party or an attorney for: [¶] . . . [¶] (2) Including in the record any matter not reasonably material to the appeal's determination . . . ." In short, it is the appellate court who decides what is and is not "reasonably necessary" to an appeal.

To the degree that Alan might arguably have not needed reporter's transcripts from hearings other than the January 2007 hearing where he lost custody of his children, it was a matter for *this court* on our own motion, or for Mary on hers, to bring to our attention in the course of the appeal. Neither applies.

Finally, on the merits of the reasonably-necessary-for-the-appeal argument we observe (technically, this is dicta) that, in the prior appeal we appreciated having those "extra" reporter's transcripts in the record. That supposedly unnecessary material told the story of this litigation in all its warts and glory (here, mostly warts), and gave us a sense of what was happening "on the ground" at the trial level. Indeed, usually pro per appellants lose on appeal because they don't include reporter's transcripts in the record; by contrast able appellate counsel usually err on the side of inclusion rather than exclusion. It is quite ironic that Alan, as a pro per appellant, was penalized at the trial court for overinclusion.[23]

In sum, the trial court erred in taxing the memorandum of costs down to $2,990 from its original figure of $5,915.81.

 Finally, there is the matter of the installment payments. Unlike a pendente lite order to pay money so that a party can afford an attorney, costs on appeal are not a matter of equity. Rule 3.1700(b)(4) treats costs on appeal as a *money judgment*, in which the clerk enters as a ministerial matter. The rule says: "After the time has passed for a motion to strike or tax costs or for determination of that motion, the clerk *must* immediately enter the *costs on the judgment*." (Italics added.) We therefore conclude that the trial judge had no authority to make the installments payable in increments.

## IV. CONCLUSIONS AND DISPOSITION

There is a Dickensian quality to the litigation between Alan and Mary, but, alas, the facts are no more horrendous than those confronted by our Supreme

---

[23] The difference between Alan's erring on the side of inclusion in the record and Mary's eagerness to file a polished formal response to Alan's initial petition is that Mary ignored the express directive of the court for an "informal response" while Alan had to work prospectively and make his best guess as to what material the appellate court might need.

Court in *Elkins*: Both cases involve pro pers thrashing around in an alien environment, where a local court had, as *Elkins* put it, elevated "efficiency and conservation of judicial resources" over "the countervailing interests of litigants as well as the interest of the public in being afforded access to justice." (*Elkins, supra,* 41 Cal.4th at p. 1353.) In each case, unfortunately, the motto "justice for all" has come perilously close to "justice for those who can afford it."[24]

That said, the existing stay is dissolved. Let a writ issue commanding the trial court to vacate its order of September 16, 2008, and to enter another order directing a judgment for costs of $5,915.81 in Alan's favor. The $9,000 attorney fee order is reversed, with directions to the trial court to hold another hearing to consider all relevant matters affecting Mary's fee request, including the taking of live testimony. Alan shall recover his costs in this writ proceeding.

Hopefully, now Alan will be able to retain counsel and the upcoming child custody hearing will be a contest of two sides each represented by able counsel.

Moreover, in line with our point that Alan did not have an adequate remedy for either of his two challenges by way of appeal, let us be very detailed about what we expect on remand. *The whole point of this case, after all, is that each side should have an equal opportunity for legal representation in the upcoming child custody hearing.*

In that regard, we do not expect this case to be handled "business as usual." Business as usual, as both Judge Firmat's perceptive article suggests,[25] and the facts of this very case confirm, has not served this family very well. Thus, to be meaningful, the custody hearing should be held well prior to the commencement of the 2009–2010 academic year, so that if the children (or one of them) must change residences, there will be some continuity as to his, her or their schooling. Since Mary's OSC for attorney fees is "preparatory" to the custody hearing, the trial court should work backward in scheduling that OSC: First schedule the child custody hearing in reasonable time for the beginning of school, then schedule Mary's remanded

---

[24] As the author of *Elkins* put it in another context, "If the motto 'and justice for all' becomes 'and justice for those who can afford it', we threaten the very underpinnings of our social contract." Compare that with the case of Dickens' fictional Stephen Blackpool, who couldn't afford a divorce in Hard Times ("But it's not for you at all. It costs money. It costs a mint of money."), quoted in *In re Marriage of Cordero* (2002) 95 Cal.App.4th 653, 659, footnote 5 [115 Cal.Rptr.2d 787].

[25] See footnote 7, *ante.*

OSC for attorney fees sufficiently prior to the child custody hearing so there can be a meaningful hearing regarding attorney fees consistent with what we have directed in this opinion.

Aronson, J., and Ikola, J., concurred.

On April 2, 2009, and April 15, 2009, the opinion was modified to read as printed above.