Filed 11/22/13  Marriage of Nigro CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re Marriage of ELIZABETH A. and THOMAS R. NIGRO. | |
| ELIZABETH A. NIGRO, <br><br> Appellant, <br><br> v. <br><br> THOMAS R. NIGRO, <br><br> Respondent. | G047511 <br><br> (Super. Ct. No. 01D003588) <br><br> O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, David L. Belz, Judge.  Affirmed.

Law Office of Elizabeth Nigro and Elizabeth A. Nigro for Appellant.

Law Offices of Thomas R. Nigro and Thomas R. Nigro for Respondent.

Elizabeth and Thomas Nigro[1] divorced in 2005, but they returned to family court due to their difficulties agreeing on the best course of action for their 15-year-old daughter Alexandra (Alex). Earlier this year, we affirmed the family court's decision to modify the parents' joint legal custody order and temporarily modify their physical custody arrangement. (*In re Marriage of Nigro* (May 3, 2013, G046170) [nonpub. opn.] (*Nigro I*).) Due to evidence Elizabeth had violated prior court orders and interfered with past efforts to correctly diagnose and treat Alex's Attention Deficit Hyper-Activity Disorder (ADHD) with the correct dosage of Adderall, the family court determined there had been a sufficient change of circumstances warranting an order giving Thomas sole legal custody over medical decisions relating to his daughter's ADHD assessment and treatment. The family court also temporarily gave Thomas sole physical custody for the duration of a non-invasive diagnostic test necessary to address Alex's medical needs.

This court also affirmed the family court's decision to sanction Elizabeth under Family Code section 271,[2] because her sabotage of an earlier court-ordered diagnostic test and other misconduct frustrated the policy of the law to promote settlement and resolution of issues. (*Nigro I, supra,* G046170.) We also affirmed the family court's denial of Elizabeth's motion for need-based attorney fees under section 2030. We agreed with the trial court's conclusion Elizabeth elected to represent herself during the trial, and her friend Merrit McKeon's performance of *additional* legal services was not reasonably necessary, and therefore, not recoverable under section 2030. (*Ibid.*)

---

[1] "As is customary in family law proceedings, we refer to the parties by their first names for purposes of clarity and not out of disrespect. [Citations.]" (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

[2] All further statutory references are to the Family Code, unless otherwise indicated.

Before we filed our opinion in *Nigro I*, Elizabeth sought need-based attorney fees and costs incurred by McKeon in preparing and handling that appeal. On August 6, 2012, the family court denied her request, and we now have for our consideration Elizabeth's appeal from that order. Finding Elizabeth's contentions on appeal lack merit, we affirm the order.

I

A detailed summary of the facts is contained in *Nigro I,* which we incorporate by reference. (*Nigro I, supra,* G046170.) Suffice it to say, Elizabeth and Thomas, both attorneys, separated in 2002 after nearly 14 years of marriage when their only daughter, Alex, was four years old. A stipulated judgment filed in 2005, awarded the parents joint custody of their daughter, with primary physical custody given to Elizabeth.

Although it appears from the record that Elizabeth and Thomas continued to have disputes following the divorce, their relationship took a bad turn in 2009 after Elizabeth filed an ex parte application for an order to show cause (OSC) to eliminate Thomas's mid-week visitation. Thomas opposed the OSC and accused Elizabeth of over medicating Alex without having a proper diagnosis. Thomas also filed an OSC requesting a full custody evaluation to determine Alex's best interests and a medical evaluation regarding Alex's need for medication. For the next two years, these issues were heavily litigated, and as discussed in *Nigro I,* ultimately resulted in a change of custody order and over $8,000 in sanctions against Elizabeth.

In March 2012, while the appeal in *Nigro I* was pending, Elizabeth filed a motion for need-based attorney fees for the appeal and future trial court litigation. She requested $40,000 for McKeon and $5,000 for trial attorney Arthur LaCilento. She explained McKeon was "well-known as an appellate attorney. [Elizabeth] has no expertise in appellate practice, and will have minimal involvement in the appeal. Clearly [Elizabeth] has the need for . . . McKeon's unique services, and this request is very

3

different from [Elizabeth's] first request for fees."  In addition, Elizabeth declared that in light of the family court's earlier denial of her request for need-based fees, she retained LaCilento to represent her in future hearings in the trial court.  She requested $5,000 to "guarantee his availability for future hearings" and for his time appearing at one hearing in January 2012.  Elizabeth stated LaCilento will take a lead role in the case, and therefore, it cannot be said his services were merely to assist Elizabeth.

McKeon submitted a supporting declaration stating she could not afford to represent Elizabeth *in the trial court* without being paid attorney fees.  She declared that in addition "to the $25,000 I request under . . . section 2030 for the appeal, I request the court order [Thomas] to pay me $15,000 as and for a retainer for future work, so that I may join the case again."  McKeon stated she generally charges $400 an hour for her work and the case will require a minimum of 30 hours of work "or $12,000 for time, in the [s]uperior [c]ourt case.  The additional $3,000 is needed for costs, including transcripts."  She did not mention LaCilento or his role in the litigation.

Elizabeth submitted evidence Thomas had the ability to pay her fees, and she needed his contribution under section 4320.  She asserted the court must consider Thomas's new wife's income, and that Elizabeth's husband's social security income was reduced from $627 to $520 a month due to a Medicare deduction.  Citing *Hunter v. Hunter* (1962) 202 Cal.App.2d 84, 92-93 (*Hunter*), Elizabeth argued she met all the conditions and requirements for need-based attorney fees and costs to pursue her appeal.

Elizabeth's supporting declaration explained she could not afford to pay McKeon, and for this reason she currently was not charging McKeon rent on an office space sublet from Elizabeth's suite.  Elizabeth stated she also paid for McKeon's access to Westlaw, and she advanced $4,060 for the costs of filing and obtaining transcripts for the appeal.  Elizabeth asserted Thomas's new wife was extremely wealthy.  She admitted Thomas represented himself on appeal and drafted his own response to her writ petition.  Elizabeth explained she had only "done two appeals in [her] career, and lost both" and

4

therefore she regularly refers all her appellate work to "more specialized appellate practitioners."

The court took the matter under submission and issued a statement of decision in May 2012. On the issue of trial court fees, the family court noted Elizabeth may have an attorney represent her in upcoming superior court matters. It determined if Elizabeth wanted LaCilento to simply "help her 'bear the stress of these proceedings' and have [Thomas] pay for it, while [Elizabeth] herself is the de facto attorney, then the request for attorney fees for . . . LaCilento would be denied. [Elizabeth] cannot have it both ways. . . . If . . . LaCilento is to be the attorney of record, then he must file a [s]ubstitution of [a]ttorney."

The court stated LaCilento allegedly incurred $3,500 in fees although he was not the attorney of record. The court stated it was not necessary to be attorney of record before requesting fees, but Elizabeth must show he was retained before the fees were incurred. It stated, "The court cannot conclude from the record whether LaCilento's role during the time the $3,500 in attorney fees were generated was similar to McKeon's prior role. [Elizabeth] states . . . LaCilento assisted her at the January 25, 2012 hearing in getting both parties together, and later in another dispute in February regarding custody. The court cannot tell if . . . LaCilento was an active participant or acting more in the role of a friend lending moral support to [Elizabeth] while she primarily continued to represent herself." The court indicated it would need to see a copy of a fee agreement entered into prior to the date of the proceedings before it would consider awarding LaCilento $3,500 for attorney fees.

The court denied Elizabeth's request for $5,000 in attorney fees for anticipated future services. The court stated it was unclear what proceedings Elizabeth was referring to because there were no pending OSCs and there was no indication what role, if any, LaCilento would have in the pending "DCSS matter." The court noted the

5

DCSS proceedings would be independent of the family court case, and there was simply not enough information to award $5,000 for fees "going forward."

On the issue of appellate fees, the court stated McKeon was initially seeking both appellate and trial court fees. The court stated McKeon was no longer requesting trial court fees, and based on McKeon's declaration filed on March 9, 2012, it appeared Elizabeth did not seek support from or retain LaCilento until sometime after McKeon filed her declaration. McKeon's declaration supports the conclusion LaCilento was not "in the fee request picture" until after March 9, 2012. The court noted Elizabeth was seeking payment for LaCilento's purported attorney fees incurred prior to March 9.

The court stated Elizabeth was entitled to counsel to prepare her appeal, but the question was whether Thomas was required to pay for it. McKeon had reduced the fee request from $25,000 to $21,400. The court stated it would reduce the amount requested by an additional $2,400, representing the six hours (at $400 per hour) McKeon spent briefing a request for sanctions on appeal. This left a total of $19,000 in appellate fees and costs.

The court next considered if Elizabeth's appeal was taken in good faith and made on reasonable grounds, two requirements mentioned in *Hunter, supra,* 202 Cal.App.2d at pages 92-93, that trial courts should consider in determining need-based fees for appellate work. The court determined Elizabeth had a good faith reason for bringing the appeal because the challenged ruling was "an issue of 'character and reputation' for her." The court also determined there was reasonable grounds for the appeal.

The court stated the next step was to determine Elizabeth's "need" and whether Thomas has the ability to pay all or a portion of the fees. The court determined it had insufficient evidence to address these issues because both parties challenged the filed income and expense declarations. The court ordered both parties to file "current" income and expense declarations as well as declarations addressing the factors set forth in

6

section 4320 regarding the need and ability to pay attorney fees. It scheduled a hearing for 30 days later.

The hearing was continued to July 30, 2012. The court considered the income and expense declarations, the parties' testimony, and other submitted evidence. Elizabeth stated she was not seeking fees for LaCilento because he was representing her in the DCSS court, and she would seek his fees there. The court took the matter under submission and on August 6, 2012, filed its statement of decision.

The court began its statement of decision by clarifying the matter to be decided was Elizabeth's request for need-based attorney fees to have McKeon assist in her appeal and for LaCilento to represent her in future trial court proceedings. It noted, "The reasonable fees were determined to be $19,400 plus $4,500 in appellate costs." It stated the remaining issues pertained to the requirements of need and ability to pay, as stated in the *Hunter* case. The court commented it had already determined the other requirements, i.e., that the appeal was brought in good faith and there were reasonable grounds for the appeal.

In its statement of decision, the court stated it considered the current income and expense declarations, the parties' testimony, and supporting documentation. Citing section 2030, the court stated it was required to make sure each party had access to legal representation and to accomplish this goal it must consider the following factors: (1) the parties' earnings and resources; (2) the parties' needs; (3) the nature of the case; (4) the skill and time devoted by counsel in handling the case; and (5) the reasonableness of the fees requested. In addition, the court noted the determination of attorney fees "is a complex process involving the weighing and balancing of a host of factors." Citing *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 254 (*Alan S.*), the court explained the determination is not a "'truncated process'" where a court merely determines which party has a higher income or fashions an award representing merely a manageable amount to the party having a lower income. It explained the process was not strictly an

7

economic analysis, and a party's financial resources are only one factor for the court to consider. (Citing *In re Marriage of Dietz* (2009) 176 Cal.App.4th 387 (*Dietz*); *In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 933.) In addition, the court stated it had considered "all the relevant portions of the record, particularly the evidence pertaining to the parties' needs and resources, the prior [i]ncome and [e]xpense [d]eclarations filed by both parties in this case . . . [and this court] has endeavored to apply the foregoing principles in an appropriate exercise of discretion."

The court next made the following factual findings regarding the parties. It reiterated the fact both parties in the case were practicing attorneys. Based on Thomas's income and expense declarations, the court concluded his income was sporadic because he was a contingency fee attorney. He attributed Thomas with earning $4,484.70 a month, and his new wife earning $6,000 a month (for a total of $10,484). Thomas's bank account showed several large deposits over the past year and he had a cash balance of $110,000. The court commented Thomas did not intend to hire an appellate attorney to defend Elizabeth's appeal. And although Elizabeth claimed Thomas had additional income from two rental properties, the court noted Thomas testified he did not have any net cash flow from these rentals. His shared expenses with his wife totaled $7,727 per month, including an installment payment debt of $41,000. The court concluded Thomas's household included his wife, stepdaughter, and Alex, and he had the ability to pay some or all of Elizabeth's appellate attorney fees.

The court made the following factual finding and conclusions regarding Elizabeth. Her "updated" income and expense declaration reported $16,440 income and $14,765 in personal monthly expenses. She had the additional asset of $21,600 in cash. She received $900 per month in child support.

Citing the *Alan S.* case, the court determined it was appropriate to analyze the nature of Elizabeth's claimed expenses. It noted Elizabeth was making $6,323 payments to her "credit cards, [home equity line of credit (HELOC),] and car payments."

8

It calculated, "The total amount of the debts listed is $78,067." Elizabeth testified she recently purchased a $17,000 car for her husband because he crashed his vehicle and was disabled. The court stated Elizabeth admitted during cross-examination that she was "paying far more than the minimum monthly payments required to avoid late fee penalties. [She] testified that 'I always pay more than asked for to reduce the balance on my accounts.' The balances on the installment/credit card debt has fluctuated over the months according to the prior [income and expense declarations] but the installment payments have been consistently high."

The court acknowledged Thomas's argument that Elizabeth was asking him to pay her appellate fees so she could continue paying down her credit card debt by making higher than the minimum payments due. Thomas maintained this was unfair. The court appeared to agree because it discussed the balances and annual percentage rates on Elizabeth's various credit cards and concluded she was voluntarily making payments of $5,100 per month, when the minimum payments "would be in the $900 per month range." The court determined Elizabeth "could voluntarily during the pendency of her appeal reduce her monthly expenses from $14,765 to close to $10,200[] per month."

In the final section of the statement of decision, the court stated it had prepared "an Xspouse print out using the income and expense numbers [provided by the parties].[3] The report shows net spendable monthly income for [Elizabeth] of $13,013[]. This report shows [Elizabeth] has options to cover the cost of her attorney fees for the appeal and that she does not have a "need" pursuant to [sections 2030 and 2032]. In addition, [Elizabeth] has cash on hand to cover the costs for the appeal." [¶] Given the relative circumstances of the parties, the court cannot justify an award of appellate

---

3        Xspouse is one of the privately developed computer programs used to calculate guideline child support under the formula required by section 4055. (See *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1079 [Xspouse new rival to the DissoMaster program].)

attorney fees by [Thomas] to [Elizabeth] in this case. [¶] The request for attorney fees is DENIED."

II

*A. General Legal Principles Regarding Need-based Attorney Fee Awards*

"During the pendency of a dissolution action, a court may order that one party pay some or all of the other party's legal fees and costs. (§ 2030 et seq.) '"California's public policy in favor of expeditious and final resolution of marital dissolution actions is best accomplished by providing at the outset of litigation, consistent with the financial circumstances of the parties, a parity between spouses in their ability to obtain effective legal representation."' [Citation.]" (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866 (*Keech*).) "It may be a little surprising to some, but the purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength. [Citation.]" (*Alan S., supra,* 172 Cal.App.4th at p. 251.)

"[A] motion for attorney fees and costs in a dissolution proceeding is left to the sound discretion of the trial court. [Citations.] In the absence of a clear showing of abuse, its determination will not be disturbed on appeal. [Citations.] '[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]' [Citation.]" (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769 (*Sullivan*); *Keech, supra,* 75 Cal.App.4th at p. 866.)

However, "[t]he trial court's discretion in this area is . . . limited by the statutes which enable the exercise of that discretion. [¶] Under section 2030, subdivision (a): 'During the pendency of a proceeding for dissolution of marriage . . . , the court may, upon (1) *determining an ability to pay* and (2) consideration of the

10

*respective* incomes and needs of the parties in order to ensure that *each* party has access to legal representation to preserve all of the party's rights, order any party . . . to pay the amount *reasonably necessary* for attorney[] fees and for the cost of maintaining or defending the proceeding.' (Italics added.) Under section 2032: '(a) The court may make an award of attorney[] fees and costs under [s]ection 2030 . . . where the making of the award, and the amount of the award, are *just and reasonable under the relative circumstances* of the respective parties. [¶] (b) In determining what is just and reasonable under the relative circumstances, the court *shall* take into consideration the need for the award to enable *each* party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in [s]ection 4320 [the factors for determination of "permanent spousal support"] . . . . Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances.' (Italics added.)" (*Keech, supra,* 75 Cal.App.4th at pp. 866-867.)

*B. Rules Regarding Need-based Awards for Postjudgment Proceedings*

It is well settled the trial court is authorized to order payment of attorney fees and costs for a party to pursue an appeal (§ 2030, subd. (a)(1) ["the court shall ensure each party has access to legal representation" at trial "and in any proceeding subsequent to entry of a related judgment"]). Marital dissolution proceedings are deemed "pending" during an appeal, and the award of fees and costs may be made on the same basis as an award to obtain representation at trial. (Code Civ. Proc., § 1049; 11 Witkin & Epstein, Summary of Cal. Law (10th ed. 2005) Husband & Wife, § 179, p. 244 (hereafter Witkin).)

Consequently, a need-based fee award may be made under the authority of sections 2030 and 2032 "when 'just and reasonable' under the parties' 'relative circumstances' to ensure a 'parity' of litigating strengths." (Hogoboom & King, Cal.

11

Practice Guide: Family Law (The Rutter Group 2013) [¶] 16:421, p. 16-120 (hereafter Hogoboom).) "Where necessary to enable a financially disadvantaged spouse to prosecute or defend an appeal, appellate attorney fees may be (and *should be*) awarded *pendente lite*. [Citation.]" (*Ibid.*)

Both the Witkin and Hogoboom treatises recognize that "Traditionally, to warrant a need-based award of fees and costs on appeal, four conditions must be met:

"• The requesting spouse must show *need* for the award;

"• The other spouse must have the *ability* to pay the fees;

"• The appeal (or appellate response) must be in *good faith*; and

"• In the case of an award to appellant, there must be *reasonable grounds* for the appeal or, in the case of an award to respondent, the appellate response must be 'reasonable in character.' (But in either case, it need not be shown the party seeking the fee award prevailed on appeal.) [Citations.]" (Hogoboom, *supra*, [¶] 16:422, p. 16-120; Witkin, *supra*, § 179, p. 244.) Citing to *Hunter, supra,* 202 Cal.App.2d at page 92, the Witkin treatise explains, "Where the record raises a genuine issue, and the appeal is taken in good faith, it is error to deny an award of fees." (Witkin, *supra*, § 179, p. 244.)

Based on the above, it cannot be overlooked there are different requirements to successfully obtain need-based fees and costs relating to trial court proceedings, as opposed to fees and costs incurred on appeal. In short, the latter requires a showing the appeal or appellate response was made in good faith and was based on reasonable grounds.

Elizabeth questions whether the law has changed regarding the requirements for need-based appellate fees in light of the *Alan S.* and *Keech* cases. As we will now explain, we conclude the four traditional requirements have not changed, but trial courts are now required to undertake a broader analysis of the parties' relative circumstances as provided by the new statutory framework (see § 2030) when considering the requirements of "need" and "ability to pay."

12

*Hogoboom* and *Witkin* both agree the conditions of "need" and "ability to pay" requires the same kind of demonstration of proof by the requesting party, regardless of whether the fees were incurred in the trial court or on appeal. Thus, when considering the "need" for appellate fees, the court must consider the factors listed in sections 2030 and 2032, and related case authority such as *Alan S.* and *Keech* (applying the statutory factors). As such, the applicant spouse may demonstrate "need" even if she or he has sufficient financial resources to pay for his or her own appeal. For example, in the case *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, the appellate court affirmed a need-based fee order to a wife with $14 million in assets and income in excess of $30,000 per month, based on the fact the husband was far wealthier ($64 million in liquid assets compared to the wife's $7.5 million in liquid assets). (*Id.* at pp. 633, 636-637, 662-663.)

After searching the body of case authority regarding need-based appellate fee awards, we found no express reason stated for the two additional requirements of "good faith" and "reasonable grounds" for an award of need-based appellate fees. Nevertheless, we conclude the additional conditions are logically and legally sound for the following reasons. The purpose of a section 2030 fee award before a trial is to insure each party has sufficient resources to adequately litigate the controversy, and the request may be made initially in the petition or response at the commencement of the case. (Hogoboom, *supra*, [¶] 14:150, p. 14-49.) The trial court must determine "how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances. [Citation.]" (*Dietz, supra,* 176 Cal.App.4th at p. 406.) Consequently, "The proper legal standard for determining whether to award attorney fees in such proceedings is not whether the proceedings were brought in good faith or in earnest . . . ." (*Ibid.*) That is not to say parties will be awarded fees for bad faith conduct. Anytime during the trial proceedings, the court has the independent authority to assess fees and costs against parties and their counsel under various sanctions statutes. (Hogoboom, *supra*, [¶] 14:230, p. 14-76.1.) For example, if a party unreasonably drives

13

up litigation costs, the court may award attorney fees and costs as sanctions. (§ 271.) "Thus, without regard to need, [section 271] effectively authorizes a fees and costs award as a *penalty* for obstreperous conduct. [Citations.]" (Hogoboom, *supra*, [¶] 14:233, p. 14-76.2.)

We recognize the parties are subject to the same section 271 sanctions for misconduct occurring during an appeal. (Hogoboom, *supra*, [¶] 14:9, p. 14-4.) However, this sanction is designed to remedy the situation were one party frustrates the policy of the law to reduce litigation costs by failing to follow basic rules of appellate practice. Section 271 sanctions provide little solace to the spouse asked to finance an appeal (or appellate response) made from the start in bad faith or on unreasonable grounds. Equity supports including additional requirements when considering a request for need-based attorney fees for appellate proceedings.

*C. Did the Trial Court Improperly Apply Outdated Law?*

Elizabeth contends we must review the trial court's ruling de novo because the trial court relied on *Hunter, supra,* 202 Cal.App.2d 84, which she claims "no longer reflects current California family law and led the trial court to erroneously decide this case." She is wrong.

We note Elizabeth cited to the *Hunter* case in her request for appellate fees. In her moving papers, she explained the *Hunter* case listed the four traditional requirements for a need-based award of appellate fees. She was right. As explained above, the four conditions listed in *Hunter* are still relevant and continue to be utilized in current legal authority. (See *In re Marriage of Jovel* (1996) 49 Cal.App.4th 575, 586; *In re Marriage of Ward* (1992) 3 Cal.App.4th 618, 629; *In re Marriage of Joseph* (1990) 217 Cal.App.3d 1277, 1290; *In re Marriage of Davis* (1983) 141 Cal.App.3d 71, 78.)

In *Hunter,* the court explained, "The law's purpose in allowing attorney's fees and costs to a wife who has not sufficient monies to meet such expenses is to assure to women with domestic difficulties that they will have their day in court, on appeal as

14

well as at the trial." (*Hunter, supra,* 202 Cal.App.2d at p. 92.) After reciting the four conditions warranting an award of attorney fees, the court reasoned there was no dispute wife had "no funds whatsoever" to prosecute the appeal, the husband had the ability to pay reasonable attorney fees, and the appeal was being pursued in good faith and on reasonable grounds. (*Id.* at p. 93.) It concluded the trial court abused its discretion in denying wife's application for reasonable costs and counsel fees on appeal: "To tell a woman who wishes in good faith to appeal a judgment in a divorce action and who is without funds to pay necessary counsel fees that no such fees will be allowed except possibly on an application for a final decree is practically equivalent to denying her the right to appeal unless her attorney is willing to act without compensation or for the mere possibility that some attorney's fee may be awarded later." (*Ibid.*)

If we were to apply the facts of *Hunter* to the current status of the law having a broader analysis of "need," we would nevertheless reach the same conclusion as the *Hunter* court: It was an abuse of discretion to deny fees to the wife, having no funds but who wishes in good faith to appeal the divorce judgment in favor of husband, who had the ability to pay. We find no basis to conclude the case must be reversed due to the trial court's reference to the *Hunter* case in discussing the four requirements for need-based appellate fee.

Alternatively, Elizabeth faults the trial court for erroneously applying the "'truncated approach'" used by courts in the 1960s, when the *Hunter* case was written. Specifically, she makes the bold assertion the trial court may have correctly considered the factors of *Alan S.,* and section 2032 "but then barred relief of fees and costs based on the 'need element' of *Hunter* . . . . Although the trial court's decision on [the] submitted matter correctly reasoned that the 'factors' discussed in *Alan S.* must be considered to 'get the big picture' the court inappropriately marched this 'host of factors' into each of the defined 'elements' of *Hunter* . . . ." We understand this argument to be asserting that in essence the court reviewed and analyzed all the correct factors of *Alan S.,* but then

15

rejected them all in favor of an outdated and truncated approach specifically rejected by *Alan S.* and *Keech.* The sole factual basis for her contention is that the court cited to the *Hunter* case two times in its ruling. She must be assuming the trial court's citation to a 1962 case necessarily meant it applied an outdated approach for assessing "need." (*Alan S., supra,* 172 Cal.App.4th at p. 254 [explaining modern approach for assessing "need"].) Her assumption is belied by the record.

The record clearly reflects the trial court considered the four requirements for need-based appellate fees with the clear understanding its determination of Elizabeth's "need" for fees required a broad analysis of the respective circumstances of both parties. The court held two hearings on the issue of need-based fees. At the first hearing, the trial court determined Elizabeth's appeal was brought in good faith and on reasonable grounds (two of the four conditions relevant to need-based appellate fees and costs). Before deciding the other two factors, the court continued the hearing and requested the parties submit current income and expense declarations as well as declarations addressing the factors set forth in section 4320 [need-based spousal support]. This action suggests the court understood Elizabeth's "need" for fees would require a "big picture" analysis of the case and a determination of the parties' relative circumstances.

At the second hearing, the court stated it planned to use "*Allen S.* and *Keech* analysis" when deciding the conditions of need and ability to pay. The parties agree in their briefing these two cases represent the correct and current analysis being used by trial courts in determining need-based fee requests. In addition, we note the court repeatedly asked the parties to focus their arguments on the *Allen S.* approach, a case which held trial courts must focus on the relevant factors discussed in sections 2030 and 2032. When the parties attempted to bring up the history of the case or past misconduct, the court repeatedly cautioned the parties it was going to focus on the current statutory and legal framework provided for need-based fee awards.

16

To accept Elizabeth's contention, we would have to ignore two pages of the statement of decision devoted to discussing the applicable legal authority, as well as the court's statement *Alan S.* was the focus of its analysis when considering the condition of "need." In its ruling, the court stated, "The determination of an attorney[] fees request is a complex process involving the weighing and balancing of a host of factors." And the court clarified it would follow the "big picture" type of analysis set forth in *Alan S.,* it had reviewed all the relevant portions of the record, and it had "endeavored to apply the foregoing principles in an appropriate exercise of discretion." Nowhere in the court's written ruling can it be inferred the court changed its mind and instead applied the outdated and truncated approach from the 1960s when analyzing the "need" element.

Moreover, the court discussed in some detail the relative circumstances of the parties as required by *Alan S.* (comprising several pages of its written ruling), and plainly focused on the factors outlined in sections 2030 and 2032. The court stated it had assessed the parties' respective income and needs, noted they had different access to funds, and concluded Thomas had the ability to pay some or all of Elizabeth's appellate attorney fees. However, it also concluded Elizabeth did "not have a 'need' pursuant to . . . [sections 2030 and 2032]." The trial court never said Elizabeth did not have a "need" pursuant to the *Hunter* case. Instead, paraphrasing language found in section 2032 and the *Allan S.* case, the trial court stated, "Given the relative circumstances of the parties, the court cannot justify an award of appellate attorney fees by Thomas to Elizabeth in this case." Based on the record, we find absolutely no support for Elizabeth's contention the court failed to apply the well established case law (the same case law that it cited extensively in its statement of decision).

D.  *Elizabeth's Financial Circumstances*

In addition to arguing the court applied the wrong legal standard, Elizabeth makes the argument the court gave too much weight to her access to financial resources, and particularly on her ability to borrow funds and reduce payments to creditors.

17

Elizabeth also faults the trial court for failing to make a specific finding on the issue of disparity. She cites to all the evidence supporting the conclusion Thomas is the wealthier spouse and in a better position to pay her appellate fees and costs. However, in making these arguments Elizabeth is asking us to reweigh the evidence and reach a different result than the trial court. This we cannot do. As stated above, the award of need-based fees and costs is a matter left to the trial court's sound discretion. We affirm the court's order unless "'no judge could reasonably make the order made. [Citations.]' [Citation.]" (*Sullivan, supra,* 37 Cal.3d at p. 769; see also *Keech, supra,* 75 Cal.App.4th at p. 866.) Such is not the case here.

We have already concluded in this opinion, and we need not repeat the analysis, the court's ruling reflects it understood its authority and responsibility under the current rules for the award of need-based fees. The court's written ruling also shows the court reviewed appropriate evidence, including the parties' respective income declarations, expenses, and living circumstances. Contrary to Elizabeth's contention, the court did not merely focus on her financial condition. The statement of decision plainly shows the court made the following "big picture" factual findings and conclusions: The parties are both practicing attorneys and in good health. Each party was responsible for dependents. In addition to caring for Alex, Elizabeth's household included her disabled husband, and Thomas's household included his wife and stepdaughter.

The court also assessed whether there was a disparity in the parties' respective access to funds. It calculated Thomas and his wife had a combined total monthly income of approximately $10,000 per month and bank accounts having a balance of over $100,000. Thomas had additional real estate investments but those assets did not generate income. Thomas's expenses each month totaled nearly $8,000 and he had installment payment debt of $41,000. In comparison, Elizabeth's monthly income as a family law specialist was less sporadic and larger ($16,440) than Thomas's income. Elizabeth reported having $14,765 in expenses, but the court reviewed the nature of her

18

obligations and determined she was making higher than the minimum payments on her various credit cards. The court concluded a more accurate figure for her expenses was approximately $10,000 per month. In sum, Elizabeth netted more income each month than Thomas, but she had less money saved in her bank accounts and no real property investments. The court's lengthy discussion in the statement of decision reasonably supports the conclusion there was not a significant disparity between the parties with respect to financial resources.

However, Elizabeth asserts we must reverse the matter because the trial court did not expressly state any conclusion about parity. She argues that sections 2030 and 2032 "say that if parity exists, and the opposing party can pay in an appropriate proceeding, the trial court must make an award regardless of [the] moving party's access to financial resources. Yet, this [trial] court barred an award only because of Elizabeth's access to financial resources . . . ." Despite being a family law specialist, she misunderstands the law.

Section 2030, subdivision (a)(2), provides the court shall make a finding on "whether there is a *disparity in access to funds to retain counsel*, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate *disparity in access* and ability to pay, the court shall make an order awarding attorney fees and costs." (Italics added.) Disparity means there must be difference or inequality in access to funds to retain counsel. Parity is the antonym of disparity. Thus, contrary to Elizabeth's contention, if *parity* exists, the court has no duty to award fees, regardless of the other spouse's ability to pay. The purpose of section 2030 is to achieve "*parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength. [Citations.]" (*Alan S., supra,* 172 Cal.App.4th at p. 251.)

In addition, we disagree with Elizabeth's contention the court failed to make any finding about disparity because it failed to mention the words "parity" or

19

"disparity" in its written ruling. Although the court did not use those exact words, it can be inferred from its discussion of the applicable case law and the facts that the court properly evaluated the issue of disparity. "[N]o particular language is required in an order awarding attorney fees under sections 2030 and 2032, the record (including, but not limited, to the order itself), must reflect an actual exercise of discretion and a consideration of the statutory factors in the exercise of that discretion. [Citations.]" (*Alan S., supra,* 172 Cal.App.4th at pp. 254-255.) Such was the case here.

Elizabeth also complains it was improper for the court to focus on her expenses or whether she could pursue "other options" to cover the cost of her appeal. She takes great issue with the court's decision to reduce her monthly expenses (to reflect the minimum balances due on the credit cards), and that the court suggested she had enough income or savings to pay for her appeal. It cannot be said the court abused its discretion in considering this evidence. The court's focus on Elizabeth's true expenses and financial recourses was proper and relevant to the determination of whether there was disparity in the couple's access to funds. The *Alan S.* court stated it would be error not to consider expenses. (*Alan S., supra,* 172 Cal.App.4th at p. 253 ["Expenses *are* relevant to pendent-lite attorney fee orders"].) Thus, it was reasonable for the court to consider the fact Elizabeth could reduce her monthly expenses for a few months by paying the minimum amounts due on her credit cards. This action would be one way of freeing up more income to finance her appeal. Elizabeth's income and access to cash were relevant factual findings, necessary to make an accurate comparison to Thomas's financial resources.

We have no reason to doubt the court understood the evidence showing Elizabeth could pay her own appellate fees could not be the *sole reason* to deny her fee request. In the statement of decision, the court cited the well-settled rule that financial resources are only one factor for a court to consider and that it intended to follow that rule. In addition, we reject Elizabeth's contention the court only considered her financial

20

condition and ignored Thomas' resources. She argues Thomas's financial condition alone warranted the attorney fee award because overall he had more assets than her. As stated, financial resources are only *one factor* for the court to consider. Just as the trial court cannot focus solely on Elizabeth's ability to pay, the court cannot solely focus on Thomas's ability to pay as grounds for the award. Enough said.

In conclusion, we have determined the record clearly reflects the court exercised its discretion and considered the relevant statutory factors. Based on the evidence before it, the court reasonably concluded both parties had sufficient resources from which to fund the appeal. In such circumstances, the question of "need" often correlates to how large of a discrepancy exists between the spouse's financial positions. A great disparity in the parties' respective circumstances may demonstrate relative "need" even though the applicant spouse has millions of dollars in assets and the ability to pay. (*In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 884.) Conversely, "consideration of the parties' 'relative' circumstances may preclude a [section] 2030 fee award between parties of roughly equal financial means." (Hogoboom, *supra*, [¶] 14:159.2, p. 14-54.)

We find instructive *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617 (*Duncan*). In that case, husband's monthly income was 10 times greater than wife's income, but wife had been awarded $4.7 million in liquid assets of the marriage. (*Id.* at p. 630.) The court determined both parties had sufficient resources to fund the litigation, but based on their relative circumstances the court denied wife's request for fees and costs. (*Id.* at pp. 630-631.) The appellate court rejected wife's argument that husband's superior ability to pay warranted a need-based fee award. It reasoned, "In determining need, the court was required to, and did, consider the parties' relative circumstances. Those circumstances included the parties' income, expenses and assets. The court considered the discrepancy in the parties' incomes, but also considered [wife] had far greater liquid assets. Although section 2032, subdivision (b), permits an award to a

21

spouse . . . who has sufficient resources to pay, it does not 'endorse any fixed measure or percentage as a way to demonstrate need or the lack thereof.' [Citation.]" (*Duncan, supra,* 90 Cal.App.4th at p. 631.)  Absent a numerical test to demonstrate need, the court concluded both parties had adequate resources to litigate the action and it was not an abuse of discretion to deny wife's request for attorney fees.  (*Ibid.*)

Given the relative circumstances of the parties in the case before us, we agree with the trial court's assessment there was not a great disparity in financial positions.  Although Thomas had greater overall assets, Elizabeth has more net income each month and she had the ability to secure sufficient representation on appeal without Thomas's assistance.  Elizabeth argues the court's order will force her to borrow funds to pay for the fees, but this contention is belied by the evidence of sufficient cash in her savings account to cover McKeon's $19,000 bill for the appeal (as well as a sizeable amount of income exceeding her expenses each month).  We have no basis upon which to say that the trial court's determination was unreasonable.  (See *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1166-1168.)

III

The postjudgment order is affirmed.  Respondent shall recover his costs on this appeal.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

22